## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian Tribe, on its own behalf and on behalf of affected Navajo Nation citizens,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF NAVAJO AND HOPI INDIAN RELOCATION and U.S. DEPARTMENT OF THE INTERIOR, federal agencies,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Plaintiff the Navajo Nation ("Nation") brings this action on behalf of itself and over 50,000 of its affected citizens to secure prompt and proper conclusion of federal relocation for over 16,000 Navajos, 35 years past a 1986 statutory deadline, including provision of related community facilities and services and reasonable interagency assistance, as well as prevention of premature closure of a federal agency before it fully discharges its statutory functions. These claims are brought under Sections 12 and 14 of the Navajo-Hopi Settlement Act of 1974 ("Settlement Act"), Pub. L. 93-531, §§ 12, 14, 88 Stat. 1712, 1716, 1718, as amended and previously codified at 25 U.S.C. Sections 640d-11 and 640d-13 (collectively, the "Relocation Act").[1]

---

[1]*See* Navajo and Hopi Indian Relocation Amendments Act of 1980 ("1980 Act"), Pub. L. 96-305, §§ 5-6, 94 Stat. 929, 932; Navajo and Hopi Indian Relocation Amendments of 1988 ("1988 Amendments"), Pub. L. 100-666, § 4, 102 Stat. 3929, 3929; Navajo and Hopi Indian Relocation Commission, Report and Plan at 4-5, 185-94 (April 3, 1981) ("Relocation Plan"). The Relocation Act was omitted in a 2016 reorganization of 25 U.S.C. chapters 14 and 19 "as being of special and not general application." *See* 25 U.S.C. § 640d note (2016). That "[e]ditorial omission . . . has no effect on the validity of" the Act. Office of Law Rev. Counsel, U.S. House of Reps., Ed. Reclassif.: Title 25, U.S.C., at http://uscode.house.gov/editorialreclassification/t25/index.html (last visited Aug. 20, 2021). Therefore, this Complaint cites the 2015 codification of the Relocation Act for ease of reference. *See Singer v. ONHIR*, 2020 WL 4530477, *1 (D. Ariz. Aug. 6, 2020); *Rico v. ONHIR*, 2018 WL 3629109, *1 n.2 (D. Ariz. July 31, 2018).

## I.     JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction for this action under 28 U.S.C. Sections 1331 and 1362 because this action involves claims arising under the Relocation Act and is brought by a federally recognized Indian Tribe against the United States.

3.     This Court also has subject-matter jurisdiction for these claims under the Relocation Act via a federal sovereign immunity waiver under the Administrative Procedure Act ("APA") because this is "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity[.]" 5 U.S.C. § 702.

4.     Venue for this action lies in this Court under 28 U.S.C. Section 1391(e)(1) because the primary federal agency that has been implementing the Relocation Act over the last four decades has offices and has acted within this judicial district. Namely, this action concerns extensive but insufficient and incomplete relocation of Navajos by the U.S. Office of Navajo and Hopi Indian Relocation ("ONHIR"), with offices in Flagstaff, Sanders, and Chambers, Arizona.

5.     Venue for this action also lies in this Court under 28 U.S.C. Section 1391(e)(1) because a substantial part of the events and omissions giving rise to these claims against federal agencies have occurred and failed to occur within this judicial district. Namely, ONHIR and its predecessor, the Navajo and Hopi Indian Relocation Commission ("NHIRC"), have relocated over 3,700 households of Navajo families comprising over 16,000 Navajo citizens from their ancestral lands within the 1882 Reservation established within this judicial district, mostly to elsewhere within this judicial district. However, ONHIR has failed within this judicial district to assure for such households at on-reservation relocation sites the availability of related community facilities and services, such as water, sewers, roads, schools, and health facilities, as required by the

Relocation Act. Also, ONHIR and the U.S. Department of the Interior ("DOI") have repeatedly pursued and continue to pursue ONHIR's closure, which would prevent or impede completion of relocation within this judicial district, even though the Relocation Act requires provision of reasonable interagency assistance in implementing the Relocation Act and precludes ONHIR's closure until its functions have been fully discharged.

6.      The 1882 Reservation is located in northeast Arizona, north of Winslow. It includes (1) Grazing District Six ("District 6"), which was later adjudicated for the Hopi Tribe, as well as (2) the former Joint Use Area ("JUA"), which was partitioned per the Relocation Act into (a) Navajo-Partitioned Land ("NPL") for the Nation and (b) Hopi-Partitioned Land ("HPL") the Hopi Tribe. *See* 25 U.S.C. §§ 640d(a), 640d-7(b), 640d-9. All this is shown as follows:



Sources: U.S. Gov't Accountability Office ("GAO"), ONHIR: Executive Branch and Legislative Action Needed for Closure and Transfer of Activities, No. GAO-18-266, at 6 (April 2018) ("2018 GAO Report"); Relocation Plan at 197. *See* Exec. Order of Dec. 16, 1882, reprinted in *Healing v. Jones*, 210 F. Supp. 125, 129 n.1 (D. Ariz. 1962), *aff'd*, 373 U.S. 758 (1963).

## II.     PARTIES

7.     Defendant ONHIR is an independent executive branch entity established in 1988 as the successor agency to the former NHIRC. 25 U.S.C. §§ 640d-11(a), (c). ONHIR and its Commissioner are collectively referred to here as "ONHIR" because in 1994 full authority for ONHIR was delegated to its Executive Director and ONHIR has not had a Commissioner since 1994. Under the Relocation Act, ONHIR is responsible for the relocation of Navajo households from HPL and District 6 and for implementing the Relocation Plan that the NHIRC prepared and submitted to Congress and which became effective under the Relocation Act. *See* 25 U.S.C. §§ 640d-11, -13, -14. No other federal agency has legal authority to implement the Relocation Act apart from providing reasonable assistance to implement the Relocation Plan as called upon by ONHIR subject to ONHIR's remaining control over and responsibility for completing relocation. *See id.* § 640d-11(e)(1); 2018 GAO Report at 39, 53, 54.

8.     Defendant DOI is responsible under federal law to manage all Indian affairs and all matters arising out of Indian relations, *see* 25 U.S.C. §§ 1a, 2; 43 U.S.C. § 1457(10), and has been assisting ONHIR to facilitate premature closure of ONHIR contrary to 25 U.S.C. Section 640d-11(f) rather than providing reasonable assistance in implementing the Relocation Plan per 25 U.S.C. Section 640d-11(e).

9.     Plaintiff is a federally recognized Indian Tribe, 86 Fed. Reg. 7554, 7556 (Jan. 29, 2021). Under Navajo Foundational Law, the Nation has fundamental duty to preserve, protect, and enhance the *Diné* (Navajo) way of life and culture to ensure the survival, development, and growth of the Nation. 1 N.N.C. § 202. Also, *Diné* Traditional Law establishes that Navajo leaders must carry out their duties and responsibilities in representing the *Diné* people, always act in their interest, and ensure the rights and freedoms of generations yet to come. *Id.* § 203(A), (B).

4

10.     The Nation has distinct sovereign and quasi-sovereign interests in (i) protecting its survival and development and the interests of its citizens, their rights, their way of life, and their culture; (ii) assuring that federal laws are properly applied within its territory and to its citizens; (iii) minimizing undue additional financial and administrative burdens on the Nation and its citizens caused by federal failures to timely and properly complete relocation of Navajo citizens under the Relocation Act and Plan; (iv) preventing premature ONHIR closure and unauthorized transfer rather than full discharge of ONHIR's functions; and (v) ensuring that the federal government fulfills its duties under federal law to complete federal relocation of Navajo citizens in a timely and humane manner, including with reasonable interagency assistance and required community facilities and services such as water, sewers, roads, schools, and health facilities.

11.     The Nation here also asserts claims on behalf of over 50,000 of its citizens who have been and will continue to be adversely affected by ongoing federal failures to fulfill the mandates of the Relocation Act—namely, ONHIR's unreasonable delay in fully discharging its functions as well as ONHIR's and DOI's efforts to prematurely close ONHIR before ONHIR fully discharges all its functions, instead of respectively obtaining and providing reasonable interagency assistance in properly implementing the Relocation Plan and fully discharging ONHIR's functions.

12.     The affected Navajos foremost include approximately 2,400 families ("relocatees") which originally consisted about 10,000 Navajo citizens and now consist of about 15,000 Navajo citizens including later-born children. *Cf.* 25 C.F.R. § 700.145(b) (providing relocation benefits for surviving minors). These families have been relocated from HPL and District 6 under the Relocation Act within or to various Chapters of the Nation, especially to areas surrounding the enlarged Hopi Reservation. Chapters are the Navajo Reservation's 110 local political subdivisions similar to municipalities, *see* 26 Navajo Nation Code § 2(6), as shown in the following figure:



Source: ArcGIS, Navajo Nation Political Boundaries, at https://www.arcgis.com/sharing/rest/content/items/108d7cbecbca42549c49b1454bfa7c9c/info/thumbnail/thumbnail.JPEG (last visited Aug. 23, 2021).

13.    For all on-reservation relocatees, ONHIR has failed and continues to fail to provide community facilities and services as required under the Relocation Act. For example, Calvin Tso ("Tso"), Tina Coleman ("Coleman"), and Sara Slim ("Slim") are each relocatees but have not received adequate related community facilities and services as required under the Relocation Act. They and their families are at risk of not receiving those before ONHIR closes with DOI's

assistance without ONHIR fully discharging its functions and obtaining reasonable interagency assistance under the Relocation Act, over 35 years after the deadline for completion of relocation.

14.     Tso was born and raised in the Mosquito Springs area of HPL near the Tsé Dildó'ii (f.k.a. Hard Rock) Chapter of the Nation, but in 2001 relocated to the Nahata Dziil Chapter ("NDC") of the Nation with his parents and where he still lives in their relocation house with his three minor children. Tso did not want to move but was forced to do so to maintain his livelihood and his livestock of cattle, goats, and a horse. When Tso's family was relocated, ONHIR committed that there would be water, grocery stores, schools, hospitals, and police, as well as vocational training and work opportunities so that their lives would be better. However, the NDC water infrastructure has small lines and does not function as needed, with no or low water pressure. Also, Tso's family has to drive to Zuni Pueblo in New Mexico or Gallup, New Mexico for grocery needs. In addition, all Tso's children have to ride a school bus for four hours each day. Finally, the clinic by the NDC Chapter House in Sanders has limited services. If Tso's family has an emergency, they must go to the medical clinic at Zuni Pueblo or the hospital in Gallup.

15.     Coleman was raised in the Blue Canyon area of HPL but relocated in 2005 with her family to the NDC, where they still live in their relocation house. Coleman relocated there after ONHIR made commitments that ONHIR would provide community facilities to relocatees, but those facilities are terribly insufficient. In May 2021, Coleman's daughter was bitten by a feral dog, and they had to make a three-hour round-trip drive to the closest hospital with emergency treatment facilities to have her daughter checked by a physician because there are insufficient health facilities at NDC. Also, Coleman's relocation house has been broken into several times but it has taken police several days to respond each time because of no nearby police station.

16.     Finally, Slim relocated from the Howell Mesa area on HPL with her family in 1994 when she was 24 to just northwest of HPL, within the Tonalea Chapter of the Nation, where she still lives in her family's relocation home on NPL. When Slim's family was relocated, her family was promised that they would be moved to an area where they could continue to practice their religious, agriculture, and economic lifestyle. That consisted of practicing a traditional Navajo life and breeding horses and sheep. Additionally, her family was promised that their existing Navajo clan and communal relationships would continue in their relocated home. However, none of those promises or commitments have been honored. Slim's family lost the ability to practice their traditional Navajo religion and lifestyle because they are prevented from visiting certain religious sites during certain times of the year. Moreover, the community facilities in Tonalea do not meet the Chapter's population demands. There is no fire department and any emergency services must come from Tuba City, 21 miles away. Moreover, additional educational facilities and services are needed. Also, there is still no Chapter House after the previously built facility was condemned in 2012, as a new facility currently remains under construction.

17.     In addition to the needs for all on-reservation relocatees, some recent relocatees have yet additional ongoing needs that are ONHIR's responsibility. ONHIR currently reports that there are eight recent relocatees who are Navajo heads of household that have received relocation benefits, including an on-reservation relocation home, but still have open post-move files with ONHIR for possible home warranty repairs or other matters. *See* ONHIR Memo from Information Systems Team to Executive Director Christopher J. Bavasi re: Relocation Program Status for June 2021 (July 1, 2021) ("July 2021 ONHIR Status Report"); 2018 GAO Report at 24-26, 34. For such recent relocatee homeowners and their families known by ONHIR but not the Nation, ONHIR is responsible for a two-year period after relocation, and sometimes longer, under contracts to help

request and receive home warranty repairs, *see id.*, as well as for providing related community facilities and services. All those recent relocatee Navajo families risk losing home warranty services from ONHIR if ONHIR prematurely closes before ONHIR fully discharges its functions.

18.     The affected Navajos also include over 33,000 additional non-relocatee Navajo citizens who reside in Chapters with significant proportions of relocatees, many of which Chapters include former NPL and were reduced by partition. These Chapters include Black Mesa, Coalmine Canyon, Dilkon, Forest Lake, Fort Defiance, Indian Wells, Jeddito (including an island within the Hopi Reservation), Kayenta, Leupp, Low Mountain, Piñon (reduced 16% by partition), Shonto, Teesto, Tolani Lake, Tonalea/Red Lake, Tsé Dildó'ii (a.k.a. Hard Rock) (reduced by more than half by partition), Tsidii To'ii (f.k.a. Cottonwood), Whippoorwill, and White Cone. *See* Orit Tamir, Assessing the Success and Failure of Navajo Relocation, 59 Applied Anthropology 267, 268 (Summer 2000) (concerning Piñon). All those non-relocatee Navajo citizens have been harmed by the federal failure to provide community facilities and services for relocatees within their Chapters, resulting in overburdened and insufficient facilities and services for all Chapter residents.

19.     For example, Roman Bitsuie ("Bitsuie") is from the Hard Rock Chapter.  There, more than half of the land base became HPL, from which many Navajos relocated to the remaining portion of the Chapter, and ONHIR failed to provide on the remaining NPL necessary community facilities to address relocation. Through Bitsuie's personal and professional experience, he has witnessed similar negative impacts in other Navajo Chapters, including Tuba City, Tonalea, Teesto, White Cone, and Jeddito.[2] Community facilities in Hard Rock and all those other Chapters

---

[2] Bitsuie has spent almost his entire adult life working on Navajo relocation issues. Navajo-Hopi Land Settlement, S. Hrg. No. 109-183, at 82 (2005). In 1980, he started working on these issues at the Navajo-Hopi Development Office. *See id.*; Thayer Scudder, No Place to Go: Effects of Compulsory Relocation on Navajos 135 (1982) (quoting Bitsuie). That work continued when

were already overburdened and ONHIR's failures to properly address these issues have resulted in local Navajo land disputes and grazing and farming issues between the local Navajo population and relocated Navajos. As a result, each of those whole communities has been impacted by insufficient infrastructure and preventable economic and social problems have arisen and continue.

20.     The affected Navajos also include hundreds of Navajo families constituting thousands of Navajo citizens (including certified applicants, remanded applicants, denied applicants with appeals or appeal rights, and refugees, as explained below), for whom ONHIR variously has been legally required, induced relocation based on commitments, or has or may have continuing obligations to provide household relocation benefits and related community facilities and services following determinations of eligibility to receive benefits under the Relocation Act. *See, e.g.,* 2018 GAO Report at 7, 33. Some of those Navajos live on-reservation, within the Chapters that have been substantially affected by relocation, but many others of them reside in other Chapters or off-reservation. All those Navajo citizens are affected by ONHIR's ongoing failure to timely complete relocation including providing community facilities and by DOI's ongoing failure to provide reasonable assistance in implementing the Relocation Act instead of assisting ONHIR in premature efforts to close before fully discharging its functions.

---

Bitsuie served on the Navajo Nation Council from 1983 to 1987. S. Hrg. No. 109-183, at 82. From 1989 to 2011, Bitsuie served as Executive Director of the Navajo Nation's Navajo-Hopi Land Commission Office ("NHLCO"), an Executive Branch office that is devoted to these issues, reports directly to the Navajo Nation President, and works with the Navajo Nation Council's Navajo-Hopi Land Commission ("NHLC"), which is responsible for relocation issues within the Nation's Legislative Branch. When Bitsuie worked at the NHLCO, Navajo citizens came into his office every day to tell him about the hardships they suffered because of the Relocation Act, *id.* at 66, and he testified before Congress on implementation of, issues with, and impacts from Navajo relocation, *see, e.g.*, *id.* at 66-69, 82-112. After 2011, Bitsuie worked on these issues as a consultant to the Nation's Office of the President and Vice President.

21.     For example, six Navajo heads of household have been certified, either by ONHIR acting alone or per court order, as eligible to receive relocation benefits under the Relocation Act but have not yet received those benefits including relocation houses. *See* July 2021 ONHIR Status Report. Those include Rose Adley, Bernaleen Singer, Leroy Teasyatoh, Mille Shaw, George Torpey, and Ancita Tsosie. *See, e.g., Shaw v. ONHIR*, __ Fed. Appx. __, 2021 WL 2142484 (9th Cir. May 26, 2021); *Tsosie v. ONHIR*, 771 Fed. Appx. 416 (9th Cir. 2019). If ONHIR prematurely closes or fails to fully discharge its functions, in part via DOI's unreasonable assistance, those Navajo citizens and their families and other Navajo families that are later certified as eligible to receive relocation benefits like them will not be able to receive the relocation homes and related community facilities to which they are entitled under the Relocation Act, or any two-year, post-move warranty repairs if their relocation homes are on-reservation.

22.     Similarly, there are at least two Navajo citizens, Rosita George and Bernice Nelson, who have won an appeal or a remand from denials of relocation benefits under the Relocation Act, but who remain awaiting hearings and decisions by ONHIR regarding their benefits eligibility. *See George v. ONHIR*, 2020 WL 5015850 (9th Cir. Aug. 25, 2020); Order, *Nelson v. ONHIR*, No. 17-08165 (D. Ariz. July 3, 2019). If ONHIR prematurely closes or fails to fully discharge its functions, in part via DOI's unreasonable assistance, those Navajo citizens and their families, and others later similarly situated, will not be able to receive benefits eligibility determinations. And if they are certified to receive relocation benefits, they will not be able to receive relocation homes and related community facilities under the Relocation Act, or any two-year, post-move warranty repairs.

23.     In addition to the above affected Navajos, there currently are 19 relocation benefits applicants with pending judicial appeals. Those are Navajo citizens who have appealed to this Court or the Ninth Circuit from decisions by ONHIR which denied them relocation benefits. Those

applicant appellants include Eloise Begay, Justin Begay, Lula Ben Bitah, Marian Begay, Rose

Calvin, Mary Rose Charley, James John, David Johns, Laura Manygoats (deceased), Benjamin J.

Powell, Jr., Lula Stago, Frieda Thompson, Leland Todicheeney, Susan Yellowman, Bruce Yazzie,

and Joey Tom Yazzie in this Court and Annabelle Begay and Eugene Daw in the Ninth Circuit.[3]

Premature closure of ONHIR would eliminate the ability of all such similarly situated Navajo

citizens to receive relocation benefits if they win their pending appeals either outright or via

remands that result in favorable benefits determinations by ONHIR.

24.    For example, Annabelle Begay ("Annabelle") is a Navajo citizen who resided on

HPL from her birth in 1960 through 1989 and applied for relocation benefits under the Relocation

Act. However, ONHIR denied Annabelle eligibility for relocation benefits and Annabelle now has

an appeal of that denial pending before the Ninth Circuit. *See Begay v. ONHIR*, 2021 WL 2826125

(D. Ariz. July 7, 2021), *appeal filed*, No. 21-16349 (9th Cir. Aug. 16, 2021). Annabelle currently

resides in Tuba City because her family was forced to vacate their home and give up their

improvements at their HPL homesite in Coalmine Mesa in 1989 to be relocated. If Annabelle wins

her pending appeal, she will be entitled to relocation benefits under the Relocation Act. But if

ONHIR closes before Annabelle receives benefits, ONHIR will not be able to provide the benefits

that it would be required to provide to Annabelle under the Relocation Act. Annabelle also has

been affected by the delayed completion of relocation under the Relocation Act because she was

---

[3] *See, e.g., Stago, Charley, & Thompson v. ONHIR*, No. 20-08118 (D. Ariz. filed May 20, 2020); *Calvin, Yellowman, John, & Johns v. ONHIR*, No. 20-08117 (D. Ariz. filed May 20, 2020); *cf.* DOI, Office of Inspector General ("OIG"), Status of ONHIR's Appeals on Denied Eligibility Determination Cases, Report No. 2020-WR-016-B (Sept. 2020) ("2020 DOI Appeals Report") at 3 n.3 (noting eight such cases for 13 plaintiffs pending in this Court and three such cases pending in the U.S. Court of Appeals as of July 2020); 25 C.F.R. § 700.145(a) (providing for relocation benefits in certain circumstances to estates of deceased Certified Eligible Heads of Household). The Nation requests judicial notice of the cited related court filings. *See* Fed. R. Evid. 201(b)-(c).

not informed by ONHIR of her potential eligibility for relocation benefits and not given the opportunity to apply until 2009. *See* 2018 GAO Report at 72-73, 102 n.10.

25.     Next, there are currently over 100 additional Navajo citizens for whom ONHIR has denied their families relocation benefits but who could still appeal those denials in federal court within the six-year statute of limitations. *See* 28 U.S.C. § 2401(a); 2018 GAO Report at 23 (noting 240 such possible appeals as of March 2018). As of March 2020, there were 212 such possible appeals, and as of June 2020, there were 189 such possible appeals, with a recent case filed just before the six-year limitations period expired. 2020 DOI Appeals Report at 3 & n.3. Premature closure of ONHIR would eliminate the ability of all such Navajo citizens to receive relocation benefits if they file and win such appeals.

26.     Finally, there are an untold number of more than 3,208 Navajo refugee individuals or families that have been forced to relocate from HPL or District 6, who do not fit in any of the above categories but still might receive relocation benefits. Some of those Navajos applied for and have been denied relocation benefits and have not appealed from those denials, and so are known by ONHIR. However, their eligibility determinations might be required to be reopened, reheard, or reversed depending on the decisions in any of the pending or potential court appeals. *See* 2020 DOI Appeals Report at 5-6. For example, the decision in *Sands v. NHIRC*, No. CIV-85-1961 (D. Ariz. Nov. 2, 1989) required ONHIR to reopen hundreds of closed relocation files. 2018 GAO Report at 72 (ONHIR letter). The others in this group did not apply for relocation benefits but may apply and be found eligible for benefits in the future if there is another reopened application period based on decisions in any of the pending or potential court appeals. *See* 2020 DOI Appeals Report at 5-6. That happened previously due to *Herbert v. ONHIR*, 2008 WL 11338896, *7-*8 (D. Ariz. Feb. 27, 2008), which held that ONHIR breached its fiduciary duty to contact and inform all

Navajo citizens who were required to relocate from HPL that they were potentially eligible for relocation benefits. *See* 2018 GAO Report at 72-73 (ONHIR letter discussing same). That resulted in ONHIR receiving over 2,200 additional benefits applications. *Id.* at 72. Premature closure of ONHIR would eliminate the ability of all such Navajo citizens to apply for and to receive relocation benefits if they are determined to be eligible for such benefits.

27.     The Nation asserts claims here on behalf of all the above affected Navajo citizens because they each would have standing to assert the claims asserted here, their interests at stake are germane to the Nation's fundamental functions, and neither the claims asserted here nor the relief requested here require the participation of individual Navajo citizens in this suit.

## III.     RELOCATION BACKGROUND

28.     Since time immemorial for the Navajo People (*Diné*, in the *Diné bizaad* or Navajo language), each location within their sacred homelands (*Diné Bikéyah*) relative to their four sacred mountains has remained unique and critical to regular, individual ceremonial practices. Navajos have deep spiritual relationships with land, and identity with a specific place begins at birth with burial of the placenta and umbilical cord. That continues across generations, who often live nearby. Also, Navajo lands are traditionally held or used and passed through matrilineal lines for generations and cover wide areas for raising livestock, harvesting medicines and foods, conducting ceremonies, maintaining housing, and passing down knowledge for future generations.

29.     In 1882, an Executive Order prepared in three weeks to expel two Anglos from Hopi villages established a reservation in northeastern Arizona for the Hopi "'and other such Indians as the Secretary of the Interior may see fit to settle thereon.'" *Clinton v. Babbitt*, 180 F.2d 1081, 1084 (9th Cir. 1999) (quoting Executive Order of December 16, 1882 reprinted at *Healing*, 210 F. Supp. at 129 n.1); Jerry Kammer, The Second Long Walk: The Navajo-Hopi Land Dispute

27 (1980) (concerning trespass). The 1882 Reservation was defined by a degree each of longitude and latitude, covering a rectangle of about 70 miles by about 55 miles, encompassing roughly 2.5 million acres, or 3,900 square miles. *Healing*, 210 F. Supp. at 128, 133 (map). Navajo and Hopi long lived there, *id.* at 134, 144-45; *see* S. Rep. No. 93-1177, at 12 (1974), and most of the land was already occupied by Navajos, H.R. Cmte. on Approps., Investigation into the NHIRC (Jan. 22, 1985) ("NHIRC Investigation"), reprinted in Hrg. on DOI & Related Agencies Approps. for 1986 Before Subcmte. on DOI & Related Agencies, Cmte. on Approps., H.R., pt. 9, at 321 (March 25-April 16, 1985) ("1985 Hearing"). Navajos continued to move there as their population grew, H.R. Rep. 96-544, at 2 (1979), especially for livestock grazing because of the arid environment, *Healing*, 210 F. Supp. at 135; 120 Cong. Rec. 16,783 (1974); S. Hrg. No. 109-183, at 109.

30.     Consistent with Navajo customs, Navajos within the 1882 Reservation lived self-sufficiently (*t'áá hwó'ájít'éego*) in traditional homesites for generations as part of integrated physical and spiritual lifeways at harmony and in balance with the surrounding world (*hózhó*), with ongoing, unrestricted access to and responsibility for sacred sites. This also included extended kinship systems (*k'é*) of many nearby relatives and clan members. Most spoke little or no English and lived in traditional, naturally made and maintained dwellings (*hoogan*), which always face east to greet the rising sun and are necessary structures for many traditional Navajo ceremonies and practices. *See, e.g.,* Report to Hon. Harry R. McCue Re: Diné (Navajo) Families' Religious Concerns and Suggested Solutions, *Manybeads v. United States*, No. 90-15003 (9th Cir. filed Dec. 21, 1993), at 6-7; Thayer Scudder, No Place to Go: Effects of Compulsory Relocation on Navajos 33-39 (1982); Relocation Plan at 95-96, 110-11.

31.     By 1958, the Navajo population within the 1882 Reservation likely exceeded 8,800 while the Hopi population there exceeded 3,200. *Healing*, 210 F. Supp. at 145, 169. While much

of the 1882 Reservation was designated as grazing districts for Navajos based on established use, some Navajos lived in an area there that was designated in 1943 as District 6, consisting of approximately 642,000 acres set aside for Hopi. *See id.* at 133 (map), 158-59, 166, 173 (acreage); S. Rep. No. 104-363, at 2 (1996); S. Rep. No. 96-373, at 1 (1979).

32.     In 1958, Congress authorized the Nation and the Hopi Tribe to litigate territorial rights in the 1882 Reservation. Act of July 22, 1958, Pub. L. 85-547, 72 Stat. 403. A special three-judge panel of this Court ruled on the merits, *Healing*, 210 F. Supp. 126, and was affirmed by the Supreme Court, *Jones v. Healing*, 873 U.S. 758 (1963) (*per curiam*). This Court in *Healing* held that District 6 was a reservation exclusively for Hopi and that Navajo and Hopi had joint, equal, and undivided interests in the remainder (about 1.8 million acres) of the 1882 Reservation—a.k.a. the JUA, including all subsurface resources—but that the Court lacked jurisdiction to partition the JUA between Navajo and Hopi. *Healing*, 210 F. Supp. at 132, 173, 189, 192.

33.     Subsequently, Navajo use of the JUA was substantially constrained, including a forced livestock reduction and a judicially imposed building construction freeze. *See* NHIRC, Report and Plan: 1983 Update 1-2 (June 1983) ("1983 Update"); *Hamilton v. MacDonald*, 503 F.2d 1138, 1142 n.2, 1146, 1150 & n.18 (9th Cir. 1974) (affirming same). Also, the United States evicted all Navajo residents of District 6. *See* S. Rep. 109-206, at 3 (2006); *United States v. Kabinto*, 456 F.2d 1087 (9th Cir. 1972) (affirming initial evictions).

34.     By 1974, *Healing* failed to live up to the promise of its name, *Sekaquaptewa v. MacDonald* ("*Sekaquaptewa II*"), 575 F.2d 239, 241 (9th Cir. 1978), and the JUA co-tenancy proved to be unworkable, *Sekaquaptewa v. MacDonald* ("*Sekaquaptewa V*"), 626 F.2d 113, 115 (9th Cir. 1980). At that time, it was estimated that about 10,000 Navajos occupied and used lands

within the JUA, and that JUA partition would involve relocating 6,000 to 8,000 Navajos. S. Rep. 93-1177, at 13, 14 (1974); 120 Cong. Rec. 16,787 (1974); H.R. Rep. No. 96-544, at 2.

35.     As ONHIR recently acknowledged, there has been no prior successful American human relocation program, though American history is replete with the 19th Century forced relocations of Indians to Reservations, Japanese removal during World War II, and "Negro Removal" during Urban Renewal in the 1940s to 1960s. 2018 GAO Report at 65 & n.8 (ONHIR comment letter). The ongoing relocation of Navajos from HPL is the largest forced relocation of any racial group in the United States since the relocation and internment of Japanese-Americans during World War II. Hollis A. Whitson, A Policy Review of the Fed. Gov't's Relocation of Navajo Indians under P.L. 93-531 and P.L. 96-305, 27 Ariz. L. Rev. 371, 372-73 (1985).

36.     While not acknowledged by ONHIR, the United States in 1864-1866 also relocated over 8,500 Navajos via the Long Walk (*Hwéeldi*), in one of the largest and most recent forced relocations of a single American Indian Tribe in United States history. *See* Whitson, 27 Ariz. L. Rev at 374. That included forced marches of over 300 miles, killing over 200, to internment at Bosque Redondo, where an estimated 2,380 more Navajos died. The current ongoing relocation therefore is not the first time that the United States has relocated Navajos on a massive scale. *See* 2018 GAO Report at 112 (Navajo letter). It also is likely the largest forced relocation of citizens of a single American Indian Nation in about 150 years.

37.     The Long Walk matters here because Congress in the Settlement Act sought "to avoid a repetition of the unfortunate results of a number of early, official Indian relocation efforts[.]" S. Rep. 93-1177, at 20 (1974). Also, the Long Walk was specifically referenced in consideration of the Settlement Act, and the memory of that was as clear to Navajos then as it was

when Kit Carson's army marched through Canyon de Chelly to precipitate the Long Walk.[4] Moreover, the collective trauma of the Long Walk remains critical to Navajo identity as a people. *See* Thomas J. Csordas, Ritual Healing & the Politics of Identity in Contemporary Navajo Society, 26 Am. Ethnologist 3, 4 (Feb. 1999); Scudder, *supra*, at ix (forward by Navajo Chairman MacDonald); Kammer, *supra* at 24.

38.     Also relevant here is the devastating urban Indian relocation program in the late-1940s to 1950s. That was a corollary of then existing federal program to terminate and assimilate Indian tribes and began with placement programs for Navajos and Hopis in 1948. Francis Paul Prucha, The Great Father: The U.S. Gov't and the Am. Indians 1079-80 (1984); *see id.* at 1013-16 (discussing termination). That relocation program gave reservation Indians one-way tickets to cities, cut-off reservation services, and provided no sustained relocation assistance. Cohen's Handbook of Federal Indian Law § 1.06 at 88 (2012 ed.) ("Cohen's Handbook"). It became a "high-priority program" by the early 1950s, when it was implemented by a Commissioner of Indian Affairs who previously oversaw Japanese-American detention camps, *id.* at 85, 88, and was then supported by the Indian Relocation Act of 1956, Pub. L. 959, ch. 930, 70 Stat. 986. The GAO criticized the program for inadequate preparation and opportunities for relocatees, Prucha, *supra*, at 1084, and many of the relocatees lived in cultural isolation and poverty and one-third or more of them returned to their respective reservations, Cohen's Handbook § 1.06 at 88.

---

[4]Navajo-Hopi Land Dispute: Hrg. Before Senate Comm. on Interior & Insular Affairs, 93rd Cong. 256, 257 (1974) ("1974 Senate Hearing") (statement by Navajo Chairman MacDonald); Partition of Surface Rights of Navajo-Hopi Indian Land: Hearing before Senate Comm. on Indian Affairs, 93rd Cong. 217, 317-18 (1973) (quoting *Healing* regarding the Long Walk); *see Healing*, 210 F. Supp. at 135 (noting the Long Walk); 25 U.S.C. § 640d(a) (citing *Healing*).

39.     In sum, as a leading expert on compulsory relocation testified during consideration of the Settlement Act, "compulsory relocation of entire communities is an incredibly complex process which no governments have handled satisfactorily, anywhere, at any time." 1974 Senate Hearing at 281, 286 (statement of Professor Scudder).

## IV.     RELOCATION REQUIREMENTS AND EARLY IMPLEMENTATION

### A.     The Settlement Act's Relocation Requirements

40.     With the above history, Congress in 1974 enacted the Settlement Act, or *Bilagáana Bibeehaz'áanii* ("the white man's law"). Scudder, *supra*, at 132. The Act confirmed that District 6 was the Hopi Reservation and provided for partitioning the surface of the JUA and addressing the resulting effects. *See* Pub. L. 93-531, §§ 1-10, 88 Stat. 1712-16 (codified at 25 U.S.C. §§ 640d to 640d-9). However, the Nation and the Hopi Tribe were unable to negotiate or mediate partition of the JUA within the time allowed under the Settlement Act. *See* 25 U.S.C. §§ 640d to 640d-2.

41.     Therefore, per the Settlement Act, *id.* § 640d-3, the Court in 1977 ordered partition and issued a construction ban, but that was vacated on appeal and remanded. *Sekaquaptewa II*, 575 F.2d at 242 n.1, 247-48. The Court then issued a second partition order in 1979, which was affirmed and included a ban on new construction and required removal of prior construction by tribal members on land partitioned to the other tribe. *Sekaquaptewa V*, 626 F.2d 113; *see Sidney v. Zah*, 718 F.2d 1453, 1455, 1457-58 (9th Cir. 1983) (rejecting later challenges to construction ban).

42.     The Settlement Act's direction to address the effects of partition included relocation of Navajo families from HPL and Hopi from NPL. *See* Pub. L. 93-531, §§ 13-15, 88 Stat. 1717-20 (codified at 25 U.S.C. §§ 640d-12 to -14). To facilitate relocation, the Settlement Act also authorized and directed DOI to transfer from the U.S. Bureau of Land Management ("BLM") and to acquire from the Nation land within Arizona and New Mexico to be held in trust for the Nation. Pub. L. 93-531, § 11(a)-(b), 88 Stat. 1716, *superseded by* Pub. L. 96-305, § 4, 94 Stat. 930-31

(codified at 25 U.S.C. § 640d-10(a)-(b)). Those lands came to be called the "New Lands," 25 C.F.R. § 700.701 (definition), and mostly included an area that became the NDC. ONHIR, Plan Update 43, 79, 90-91 (Nov. 22, 1990) ("1990 Update"). The Settlement Act also directed DOI to begin reducing the numbers of livestock being grazed on lands within the JUA. Pub. L. 93-531, § 19(a), 88 Stat. 1721-22 (codified at 25 U.S.C. § 640d-18(a)). That severely affected Navajos. *See* Whitson, 27 Ariz. L. Rev. at 406-07.

43.	In defining the relocation program, Congress specified certain "guiding principles":

9. . . . [D]ivision of the lands of the Joint use area must be undertaken in conjunction with a thorough and generous relocation program to minimize the adverse social, economic, and cultural impacts of relocation on affected tribal members and to avoid a repetition of the unfortunate results of a number of early, official Indian relocation efforts;
*	*	*	*
11. . . [B]ecause of the Federal Government's repeated failure to resolve the land disputes, the major costs of resolution should be properly borne by the United States.

S. Rep. 93-1177, at 19-20 (1974). Congress wanted "strong assurances of honoring the guiding principle of minimizing the social, economic and cultural disruptions which are normally associated with relocation efforts[,]" so it was "vitally important" that the relocation plan take in account all those adverse impacts and it was "particularly important that the plan assure the availability of community facilities and services at relocation sites." *Id.* at 34, 35.

44.	Governed by those principles, Congress in the 1974 Settlement Act established the NHIRC as an independent entity in the Executive Branch, which "shall cease to exist when the President determines that its functions have been fully discharged." Pub. L. 93-531 §§ 12(a), (i), 88 Stat. 1716, 1717, *superseded by* Pub. L. 100-666, § 4, 102 Stat. 3929 (codified at 25 U.S.C. §§ 640d-11(a), (i)) (replacing the NHIRC with ONHIR). Thus, the NHIRC was expressly established to be a "temporary" agency. GAO, Review of the NHIRC's Program, CED-81-139, at

20

3 (July 2, 1981) ("1981 GAO Report"). Per Congress's direction, the DOI Secretary in 1975 appointed the three NHIRC Commissioners. *See id.*

45.     To implement relocation, the NHIRC's "first task was the development of a relocation plan for residents of partitioned lands." *Walker v. NHIRC*, 728 F.2d 1276, 1278 (9th Cir. 1984). For this, the Settlement Act directed the NHIRC to prepare and submit to Congress within 24 months after issuance of the Court's partition order (i.e., by 1981) "a report concerning the relocation of households and members thereof of each tribe and their personal property including livestock, from lands partitioned to the other tribe[.]" Pub. L. 93-531 § 13(a), 88 Stat. 1717 (superseded) (referencing partition per 25 U.S.C. §§ 640d-2, -3). The report was required to include the names of all Navajos residing within HPL and Hopi within NPL and the fair market value of their homes and improvements. *Id.* §§ 13(b)(1)-(2), 88 Stat. 1717 (superseded).

46.     The Settlement Act further required the following:

Such report shall include a detailed plan providing for the relocation of the households and their members identified . . . [in the report]. Such plan (hereinafter referred to as the "relocation plan") shall—
(1) be developed to the maximum extent feasible in consultation with the persons involved in such relocation and appropriate representatives of their tribal councils;
(2) take into account the adverse social, economic, cultural, and other impacts of relocation on persons involved in such relocation [i.e., the relocatees,] and be developed to minimize, to the extent possible, such impacts;
(3) identify the sites to which such households shall be relocated, including the distance[s] involved;
(4) assure that housing and related community facilities and services, such as water, sewers, roads, schools, and health facilities, for such households shall be available at their relocation sites; and
(5) take effect thirty days after the date of submission to the Congress: *Provided, however*, That the Commission is authorized and directed to proceed with voluntary relocations as promptly as practicable following its first meeting.

*Id.* § 13(c), 88 Stat. 1717-18 (previously codified at 25 U.S.C. § 640d-12(c), then superseded by 1988 Amendments, Pub. L. 100-666 § 4(d), 102 Stat. 3931, to require an additional report).

47.     Congress authorized, directed, and required relocation of Navajo citizens pursuant to the Relocation Plan regardless of whether they received related benefits. *See* 25 U.S.C. §§ 640d-13 to -14; *Masayesva v. Hale*, 118 F.3d 1371, 1375-76 (9th Cir. 1997). The possible benefits included individual compensation and payments for relocation. 25 U.S.C. §§ 640d-13 to -14. This included incentive payments for prompt relocation "after the effective date of the relocation plan," compensation for homes and improvements from which relocatees moved, and actual moving expenses as for displaced persons under uniform relocation policies. *Id.* §§ 640d-13(b), 640d-14(a)-(b). Congress also provided for payments, subject to statutory caps based on family size, for reasonable costs for construction or acquisition of "decent, safe, and sanitary replacement dwelling[s] adequate to accommodate such household[s.]" *Id.* § 640d-14(b)(2).

48.     The benefits are for those "required to relocate" under the Act. *Id.* § 640d-14(a), (b). Therefore, this relocation "has never been . . . a voluntary undertaking" for Navajos. *Manybeads v. United States*, 730 F. Supp. 115, 1520 (D. Ariz. 1989) (noting eviction threat), *aff'd*, 209 F.3d 1164 (9th Cir. 2000); *see* Scudder, *supra*, at 1 ("This relocation . . . . is compulsory because the majority of the people do not want to move."). Congress further required that "[t]he relocation shall take place in accordance with the relocation plan and shall be completed by the end of five years from the date on which the relocation plan takes effect." 25 U.S.C. § 640d-13(a).

**B.     Relocation Regulations**

49.     The NHIRC acknowledged Congress's requirements, promulgating regulations in 1976 to facilitate development of the Relocation Plan "according to the [Settlement] Act, and to carry out the directed relocation as promptly and fairly as possible with a minimum amount of

hardship and discomfort to the relocatees."[5] The regulations explained that the Relocation Plan "shall be a detailed plan providing for the relocation of the households and the members identified pursuant to the relocation report submitted to Congress, and shall be developed in accordance with the Act." 25 C.F.R. § 700.5(x) (1980) *superseded by* 25 C.F.R. § 700.93 (updated definition).

50.     The regulations provided for relocation "[p]ursuant to the relocation plan[.]" *Id.* § 700.7 (1980). Among other things, that included provisions regarding relocation standards, procedures, and eligibility requirements, *id.* § 700.11 (1980), *superseded by* 25 C.F.R. §§ 700.131-.147, and payments for relocation and purchase of improvements, *id.* § 700.10 (1980), *superseded by* 25 C.F.R. §§ 700.111-.127, .151-.213.

51.     The NHIRC subsequently revised the regulations for benefits eligibility. NHIRC, [Proposed] Revision of Regulations Concerning Eligibility for Relocation Benefits, 43 Fed. Reg. 59,400 (Dec. 20, 1978); NHIRC, [Final] Revision of Regulations Concerning Eligibility for Relocation Benefits, 44 Fed. Reg. 13,007 (March 9, 1979). In that rulemaking, the NHIRC reaffirmed Congress's guiding principles:

> The intent of Congress can be found in Senate Report No. 93-1177 . . . , which set forth the guiding principles . . . from which the Act was derived. Several of the guiding principles behind this legislation were as follows:
>
> *       *       *       *
>
> 9. That any such division of the lands of the Joint use area must be undertaken in conjunction with a thorough and generous relocation program to minimize the adverse social, economic, and cultural impacts of relocation on affected tribal members and to avoid a repetition of the unfortunate results of a number of early, official Indian relocation efforts;
>
> *       *       *       *
>
> 11. That because of the Federal Government's repeated failure to resolve the land disputes, the major costs of resolution should be properly borne by the

_____

[5] 25 C.F.R. § 700.4 (1980) (Objectives), recodified to 25 C.F.R. § 700.1(e); *see* NHIRC, [Proposed] Comm'n Operations & Relocation Procedures, 41 Fed. Reg. 38,523 (Sept. 10, 1976); NHIRC, [Final] Comm'n Operations & Relocation Procedures, 41 Fed. Reg. 49,982 (Nov. 12, 1976). Regulations cited without dates remain in effect.

United States.

The "thorough and generous" program articulated can be interpreted as applying equally to the standards by which eligibility is determined as well as to the benefits ultimately conferred, particularly in light of the expressed intent that the major costs of resolution of the whole problem of partition and relocation should be properly borne by the United States rather (it can be inferred) than by the individual Indians affected.

43 Fed. Reg. at 59,400-01.

## C.     The 1980 Act's Additional Relocation Requirements

52.     In the late 1970s, the NHIRC reported that existing land on the Navajo Reservation was insufficient to accommodate new homesites for all the expected relocatees. GAO, Indian Programs: Navajo-Hopi Resettlement Program, GAO/RCED-91-105BR, at 9-10 (March 1991) ("1991 GAO Report"); 1981 GAO Report at 6. By 1979, "it ha[d] become apparent that the impact of relocation will be quite severe, particularly for certain elderly Navajos whose families have lived for generations" within the HPL, and that "many more people will be subject to relocation and/or entitled to benefits than originally estimated in 1974." S. Rep. No. 96-373, at 2 (1979). Also, Congress became concerned about the "failure of the Executive Branch to effectively carry out the terms of the Settlement Act" despite the recognition that "the United States has an overall responsibility for this problem and its resolution." H.R. Conf. Rept. No. 96-1094, at 11 (1980).

53.     To address those concerns, Congress amended the Settlement Act via the 1980 Act to expedite and facilitate relocation. S. Rep. No. 96-373, at 3-5. Among other things, the 1980 Act augmented the NHIRC's authority as follows:

(1) The Commission is authorized to call upon any department or agency of the United States to assist the Commission in implementing its relocation plan and completing relocation within the time required by law, except that control over and responsibility for completing relocation shall remain in the Commission. In any case in which the Commission calls upon any such department or agency for assistance under this section, such department or agency shall provide reasonable assistance so requested.

(2) On failure or any agency to provide reasonable assistance as required under

paragraph (1) of this subsection, the Commission shall report such failure to the Congress.

Pub. L. 96-305, § 5(3), 94 Stat. 932 (codified as amended at 25 U.S.C. § 640d-11(e)).

54.    Through this provision, Congress—

expect[ed] that those Federal agencies having specific responsibility for Indian matters, that is, the Bureau of Indian Affairs [("BIA")] and the Indian Health Service [("IHS")], as well as other Federal agencies having programs and resources which are available to Indian tribes, will coordinate their efforts with the tribes and the Relocation Commission to aid in the implementation of the terms of the [Settlement] Act and ease the burdens of relocation.

H.R. Conf. Rept. No. 96-1094, at 11.

55.    In addition, the 1980 Act established a discretionary fund for the Commission to provide matching funds to others to "assist the Commission in carrying out its responsibilities or assist either tribe in meeting the burdens imposed by this Act." Pub. L. 96-305, § 11, 94 Stat. 933 (codified at 25 U.S.C. § 640d-25(b)(1)). The 1980 Act also amended the Settlement Act to provide for relocation of Navajos who lived within District 6, now known as the Hopi Reservation. *Id.* § 7, 94 Stat. 932 (codified at 25 U.S.C. § 640d-14(f)). Also, the 1980 Act changed the effective date for the Relocation Plan from thirty days after submission to Congress to ninety days thereafter.[6]

D.    **The 1981 Relocation Plan and Revised Regulations**

56.    The NHIRC submitted the required report including the Relocation Plan to Congress on April 8, 1981. Hrg. Before Senate Select Comm. on Indian Affairs on Report and Plan of the NHIRC, 96th Cong. 79 (1981) ("1981 Senate Hearing"); 1983 Update at 2. Congress held a hearing on the Relocation Plan and did not take any action to reject it within ninety days

---

[6]*Id.* § 6, 94 Stat. 932 (codified at 25 U.S.C. § 640d-12(c)(5)). An earlier version of the 1980 Act was pocket vetoed because it would have provided for a one-house veto of the Relocation Plan, which would have violated the Presentment Clause. *See* 124 Cong. Rec. H38784 (Oct. 14, 1978) (veto message); S. Rep. No. 96-373, at 8 (1979) (noting same).

after submission. *See* 1981 Hearing at 79. Therefore, pursuant to the Settlement Act as amended by the 1980 Act, no other further action of Congress was required, the Relocation Plan took effect on July 7, 1981, and relocation was required to be completed by July 7, 1986. *See id.*; 1983 Update at 2; DOI OIG, Operations of the ONHIR, No. WR-EV-MOA-0003-2014, at 3 (Dec. 15, 2014) ("2014 DOI Report") (noting same deadline). That deadline was never changed. *Cf.* 1991 GAO Report at 9-10 (noting no new deadline set after 1986).

57.     In the 1981 report, the NHIRC enumerated 2,801 Navajo households comprised of 9,525 Navajos on HPL and 31 Hopi households comprised of 109 Hopis on NPL. Relocation Plan at 3, 31. The NHIRC also explained that it "made every effort to achieve full compliance" with Congress's ninth guiding principle for the Settlement Act. *Id.* at 113. Also, the NHIRC recognized that "[c]oordination of agency efforts is necessary because of the interrelations of problems of the relocation program" and "piecemeal approaches to problem solving are generally non-productive and ultimately result in a waste of public monies and talent[.]" *Id.* at 118.

58.     The Relocation Plan recognized that the Settlement Act "sought to reduce, if not eliminate, disruption or other adverse impacts of the relocation by providing for a thorough and generous relocation program . . . ." *Id.* at 1. Also, the Relocation Plan reaffirmed Congress's ninth guiding principle, which required "*a thorough and generous relocation program to minimize the adverse social, economic and cultural impacts of relocation on affected Tribal members and to avoid any repetition of the unfortunate results of a number of early official Indian relocation efforts.*" *Id.* (emphasis in original, quoting S. Rep. 93-1177, at 19-20). The Relocation Plan also reaffirmed the eleventh guiding principle, that "the major costs of resolution should be properly borne by the United States." *Id.* at 5 (restating S. Rep. 93-1177, at 20).

59.    The Relocation Plan also recognized that "Congress was greatly concerned that relocation of Indian families be to areas where community facilities and services exist or will exist[,]" and specifically confirmed Congress's corresponding "order" that "housing and related community facilities and services, such as water, sewers, roads, schools, and health facilities for such households shall be available at their relocation sites[.]'" *Id.* at 4 (quoting Pub. L. 93-531, § 13(c)(4), 88 Stat. 1718 (superseded)). The Relocation Plan affirmed that "[t]he Commission intends to carry out this mandate with the same vigor as a sympathetic and generous Congress conceived it." *Id.* Consistent with that, the Relocation Plan recognized that the impact of relocation on "host" communities was "within [the Commission's] proper purview and responsibility" and that relocation to new lands acquired under the law also "would necessitate the assurance of schools, roads, power, and other facilities." *Id.* at 278. This was the "keystone" of the Relocation Plan. Kammer, *supra*, at 182.

60.    The Relocation Plan recognized that unpaved roads and limited water and sewage services were prevalent throughout the Navajo Nation, and the Relocation Plan was not intended to change existing issues unrelated to relocation since the NHIRC was a special-purpose agency with limited powers. *See id.* at 185-86, 189, 211, 262-63, 267, 273-77. Still, it was clear that the 1980 Act treated the New Lands differently with an express duty to administer. *See* 25 U.S.C. § 640d-10(h). Corresponding to that and the Relocation Plan mandate to assure community services and facilities, the Relocation Plan repeatedly recognized the federal duty to assure schools, roads, power, and other facilities for relocation to the New Lands. Relocation Plan at 235-37, 270, 278. Finally, pursuant to the 1980 Act's authorization and requirement for interagency assistance, 25 U.S.C. § 640-11(e), the Relocation Plan affirmed that the NHIRC "will call for the assistance

27

the [BIA], [IHS,] and other agencies as deemed necessary" to implement the relocation program, Relocation Plan at 278.

61.     In testifying to Congress about the submitted report, the NHIRC acknowledged the "[c]ongressional mandate to achieve relocation in a manner which avoids or minimizes the impacts" and that "Congress requires the Commission to assure that community facilities and services are available at relocation sites." 1981 Senate Hearing at 16 (statement of NHIRC Chairman Roger Lewis). Consistent with that, per the Settlement Act's explicit mandate, the NHIRC testified that it will have to deal with community facilities in the New Lands, as well as in partitioned Navajo Chapters where community facilities were needed and already overloaded, where the NHRIC was also seeking to place relocatees. *Id.* at 4, 10. The NHIRC also reaffirmed that they were guided by the ninth and eleventh principles enunciated by Congress when it enacted the Settlement Act. *Id.* at 4, 17.

62.     In assessing the Relocation Plan, DOI reported that the NHIRC had "addressed its overall responsibilities in a most commendable manner" and "they have thoroughly and conscientiously addressed each of the various elements outlined in Section 13 of Public Law 93-531." *Id.* at 88. While the fact that relocation sites had not yet been identified and secured precluded "absolute assurance that community services will be available[,]" the NHIRC gave much attention to the importance of those requirements and seeing that those issues are properly addressed. *Id.*

63.     In conjunction with submitting the Relocation Plan, the NHIRC generally recodified, revised, and expanded its regulations.[7] Among other revisions, the definition of the

_____

[7]*See* NHIRC, [Proposed] Recodification, Revision & Additions to Part 700—Comm'n Operations & Relocation Procedures, 45 Fed. Reg. 15,270, 15,720 (March 9, 1981); NHIRC, [Final] Comm'n Operations & Relocation Procedures; Determination of Eligibility, Hearing and Administrative Review, 46 Fed. Reg. 46,801, 46,801 (Sept. 22, 1981); NHIRC, [Final] Comm'n

Relocation Plan was updated and the regulation on development of the Relocation Plan, 25 C.F.R. § 700.6 (1980), was omitted since by then it had been submitted to Congress, 47 Fed. Reg. at 2091; *see* 25 C.F.R. § 700.93. Also, it was made clear that subsequent relocation activities took place after the Relocation Plan became effective pursuant to the Act. 25 C.F.R. § 700.133. In addition, the statement of the purpose of the regulations was amended to clarify that they served to insure that relocatees "will not suffer the disproportionate adverse, social, economic, cultural and other impacts of relocation" and to "carry out the directed relocation as promptly and fairly as possible, with a minimum of hardship and discomfort to the relocation, in accordance with the Act." 25 C.F.R. § 700.1(a), (e). Those regulatory purposes remain in effect.

**E.      Initial Relocation Implementation And Issues**

64.      While Navajos were evicted from District 6 before the Settlement Act, *see Kabinto*, 456 F.2d at 1088, the NHIRC started relocation of Navajos from HPL in 1977, 1981 Report at 127-28. In addition to relocating families, the NHIRC made offers to potential host Chapters: "if the chapters would accept relocatees, the commission would ask Congress to appropriate funds for roads, schools, clinics, and economic development projects." Kammer, *supra*, at 182.

65.      "Almost immediately, it became apparent that the initial assistance levels were inadequate" despite the "thorough and generous" relocation program that was promised in 1974. Whitson, Ariz. L. Rev. at 386-87, 388. Additional problems with relocation were noted in the late 1970s. 1991 GAO Report at 9-10; 1981 GAO Report at 6; S. Rep. No. 96-373, at 2 (1979). In 1978, the BIA reported that people within the JUA were under stress unparalleled on the Navajo Reservation. Scudder, *supra*, at 27 (citing BIA, Former JUA Needs Assessment 168 (1978)). IHS

---

Operation & Relocation Procedures, 47 Fed. Reg. 2089, 2089 (Jan. 14, 1982); NHIRC, Comm'n Operation & Relocation Procedures; Correction, 47 Fed. Reg. 156,774 (April 13, 1982).

confirmed that in 1979. *Id.* at 27-28 (quoting Martin D. Topper, Mental Health Branch, Navajo Area Office, IHS, Mental Health Effects of Navajo Relocation in the Former JUA  16-17 (1979)). By 1979, it was projected that the relocation would impact over 5,000 Navajos and up to 90 Hopis, and impose serious economic, physiological, psychological, and sociocultural effects on relocatees, as well as Navajo residents of host communities, where many relocatees were relocated. Scudder, *supra*, at 1, 3-6, 27, 85-86.

66. In 1983, the NHIRC submitted an update to Congress on significant developments since submission of the Relocation Plan. *See* 1983 Update at transmittal letter. At that time, the NHIRC reported that 481 families had been relocated, including 469 Navajo families and 12 Hopi families, with 151 on-reservation and 330 off-reservation, though there was a steady increase in the proportion of families who relocated on-reservation and many who initially had relocated off-reservation later returned to the reservation. 1983 Update at 59-60, 66. Also, over 1100 families had been certified as eligible for relocation, but another more than 1300 estimated families had not yet been certified as eligible for relocation. *Id.* at 13. The NHIRC also acknowledged that "Total relocation will not be accomplished by July 1, 1986." *Id.*

67. The NHIRC also reported that no interagency task forces had yet been created to assist relocation. *Id.* at 20. However, task force work with other appropriate federal agencies was ongoing. *Id.* Also, the NHIRC planned to coordinate with other federal agencies to address employment, roads, utilities, and similar needs. *Id.* at 35-36. The NHIRC also reported that most residents of the (then named) Coalmine Mesa Chapter were affected by the Settlement Act and that as many as 500 households there would be relocated. *Id.* at 68. Finally, the NHIRC had used discretionary funds for various projects, including developing a water supply via the IHS and to provide electricity for the Hardrock Chapter to benefit future relocatees. *Id.* at 68-70.

68.     In 1985, the GAO reported that approximately 900 families had been relocated and an estimated 1,675 remained to be relocated or were eligible for relocation benefits, with projected completion in fiscal year ("FY") 1988. *Id*. GAO, NHIRC Estimated Relocation Cost, GAO/RCED-86-43FS (Oct. 1985) ("1985 GAO Report"). However, absent proposed appropriations, relocation would take until 1993 and cost more. *Id.* That same year, Congress appropriated funds and authorized DOI in lieu of the NHIRC to construct homes and related facilities, including roads to serve the New Lands. Dep't of Defense Approps. Act, Pub. L. 99-190, title I, 99 Stat. 1185, 1236 (Dec. 19, 1985). Also, DOI was authorized to issue leases and rights of way for housing and related facilities to be constructed on the New Lands. *Id*. However, none of the housing appropriations could be expended until the NHIRC reported on the proposed uses of the funds, including housing plans and a description of other services intended to be provided, including but not limited to water, sewers, roads, schools, and health facilities. *Id.* § 321, 99 Stat. 1266-67.

69.     The July 1986 relocation completion deadline set by the 1981 submission of the Relocation Plan was not met in part because, "instead of the anticipated 1,000 families [from 1974], over 4,000 families applied for relocation benefits." 1991 GAO Report at 9; *see also* S. Rep. No. 109-206, at 7 (noting additional factors contributing to the slow pace of relocation). By 1988, only about 2,600 Navajo families had removed from HPL, and only about half of those had received relocation benefits. H.R. Rep. No. 100-1032, at 5 (1988).

**F.     The 1988 Relocation Act Amendments**

70.     To address the various problems and delays with relocation, Congress enacted the 1988 Amendments. Pub. L. 100-666, 102 Stat. 3929 (1988). In those, Congress extended and increased relocation appropriation authorizations, eliminated the discretionary fund matching requirement, replaced the NHIRC with a single Commissioner leading the ONHIR, and further

provided for development on the New Lands. *Id*. §§ 2-4, 6, 102 Stat. 3929-31, 3932 (amending 25 U.S.C. §§ 640d-9, -11, -12, -24, -25); *see* S. Rep. No. 100-425, at 1-2 (1988). Congress restructured the three-member Commission to a single Commissioner to "improve the overall operation and efficiency of the relocation program[,] . . . . not only to complete the relocation program, but in the development of short and long term plans necessary to address the economic, educational, and social needs of Navajo families and Navajo communities that are directly and substantially affected by" the Settlement Act. S. Rep. No. 100-425, at 5.

71.     In addition, for the New Lands, the 1988 Amendments provided that "the sole authority for final planning decisions regarding the development of lands acquired pursuant to this Act shall rest with the Commissioner until such time as the Commissioner has discharged his statutory responsibility under" the entire amended Relocation Act. Pub. L. 100-666, § 8, 102 Stat. 3933 (amending 25 U.S.C. § 640d-10(h)). The 1988 Amendments also transferred to ONHIR authority that in 1985 had been given to DOI to "issue leases and rights-of-way for housing and related facilities to be constructed" on the New Lands. 25 U.S.C. § 640d-11(c)(2)(A) (referencing Pub. L. 99-190, 99 Stat. 1185, 1236 (1985), quoted here); 2018 GAO Report at 8 & n.9.

72.     These provisions were

> included out of concerns that the development of the new lands not be unnecessarily slowed down. . . . [and that] such development should be done in conformity with, and in accordance with, section 13(c)(4) which directs the Commissioner to assure that the acquisition of housing shall be provided to the relocatees simultaneously with related community facilities and services such as water, sewers, roads, schools and health facilities. Such directive is especially important in cases where the creation of a whole new community of relocatees is contemplated such as is the case with the Commission's plans to construct a "rural community" housing a[t] Sanders[, Arizona] in the New Lands.

H.R. Rep. 100-1032, at 9 (1988).

73.    The 1988 Amendments also required "an updating of the Commission's . . . [1981] Report." S. Rep. No. 100-425, at 2. The update report was required to be submitted "concerning the relocation of households and members thereof of each tribe and their personal property, including livestock, from lands partitioned to the other tribe pursuant to this Act." Pub. L. 100-666, § 4(d), 102 Stat. 3931 (codified at 25 U.S.C. § 640d-12(a)). The 1988 requirement for an update report superseded the 1974 requirement for what had become the 1981 report including the Relocation Plan because that report already had been submitted by 1988. *See* S. Rep. 109-206 at 6 (noting same for proposed repeal of succeeding version of Settlement Act § 13).

74.    The requirement for another report cannot be understood to undo the requirements for and embodied in the Relocation Plan to provide for community facilities because Congress simultaneously reinforced the requirement of former Section 13(c)(4) by reinforcing ONHIR's authority for both community planning and "related facilities to be constructed" on the New Lands. See 25 U.S.C. §§ 640d-10(h), 640d-11(c)(2)(A) (referencing Pub. L. 99-190, 99 Stat. 1185, 1236 (1985), quoted here); H.R. Rep. 100-1032, at 9; H.R. Rep. 99-450, at 295-96 (1985). Also, Congress enacted the 1988 Amendment to further "address the economic, educational, and social needs of Navajo families and Navajo communities that are directly and substantially affected by" the Settlement Act. S. Rep. No. 100-425, at 5. Furthermore, former Section 13(c)(5) provided for when the Relocation Plan took effect, Pub. L. 93-531, § 13(c)(5), 88 Stat. 1718, and the 1988 Amendments did not change the requirement that relocation "shall take place in accordance with the relocation plan and shall be completed by the end of five years from the date on which the relocation plan takes effect." 25 U.S.C. § 640d-13(a).

75.    This understanding is reinforced by the fact that an earlier version of the 1988 Amendments would have required a plan to "modify and update the 1981 Commission [relocation]

plan on how relocation is to be carried out . . . and . . . to provide that adequate housing and related community facilities and services including water, sewer, roads, schools, and health facilities are available at relocation sites." S. Rep. No. 100-425, at 7; *see* H. Hrg. Rep. 100-76 at 7-9 (reproducing relevant Senate legislation). However, that proposal was "dropped" because that requirement "would unnecessarily delay the [relocation] process" and there was not "any evidence that there was anything fundamentally wrong with the existing plan." H.R. Rep. 100-1032, at 10.

76.     In sum, through the Settlement Act, the 1980 Act, and the 1988 Amendments—collectively, the Relocation Act—and the Relocation Plan thereunder, ONHIR must complete relocation by July 7, 1986, with reasonable assistance from other federal agencies. That relocation must include processing and providing relocation housing benefits for all eligible beneficiaries, addressing post-move issues, and assuring the availability of community facilities and services at relocation sites. For on-reservation relocation, the latter includes providing or improving infrastructure for all Chapters with relocatees, especially for but not limited to the New Lands.

## V.     THE ONHIR MANAGEMENT MANUAL ("OMM") AND CONTINUING RELOCATION

### A.     The OMM And Further Implementation And Issues

77.     Over many years, the NHIRC and then the ONHIR has promulgated and revised a Management Manual. OMM at 1 ONHIR, Management Manual at 1-2 (updated Oct. 6, 2020) ("OMM"), available at https://www.onhir.gov/readingroom/index.html. By regulation, the NHIRC's and now ONHIR's operation "shall be governed by" the OMM, which "is the prescribed medium for publication of policies, procedures and instructions which are necessary to facilitate the day-to-day operations and administration of" ONHIR. 25 C.F.R. § 700.219(a).

78.     Among other provisions, the OMM provides that, for "Infrastructure projects on the existing Navajo reservation[,] . . . . ONHIR participates in such projects in proportion to the

number of relocatees living in or moving to the areas to be served." OMM § 1530 at 1 (issued 1992; rev'd/reissued 2015). In contrast, among the "Special Conditions" applicable to the New Lands, "ONHIR is funding infrastructure on the New Lands[.]" *Id.* § 1645.41.1 at 15 (issued 1993; rev'd/reissued 2011). Also, the OMM provides that ONHIR "shall develop and administer the New Lands . . . until relocation under the Office's plan is complete; at which time political and administrative authority shall be transferred to the Navajo Nation in accordance with agreements developed to accomplish that transfer." *Id.* § 1820 at 1 (issued 1996; rev'd/reissued 2011).

79.     In 1990, the new ONHIR Commissioner submitted the report required by the 1988 Amendments. 1990 Update at iii. In that 1990 Update, ONHIR reported that relocation applications had been processed for 4,392 Navajo families and 36 Hopi families, of which 2,725 Navajo and 25 Hopi families had been certified as eligible for relocation benefits and a total of 1,857 families had been moved to new homes. *Id.* at 9. The Commissioner also noted that litigation had extended the relocation benefits application deadline, so that it ultimately stopped accepting relocation applications in July 1986 (the same date as the original relocation completion deadline). *Id.* at 10; *see also* 51 Fed. Reg. 19,169 (May 28, 1986).

80.     The 1990 Update also reported on program-wide activities. 1990 Update at 7-52. Among outstanding issues, "the government already has invested significant resources in certain infrastructure developments and . . . is committed to further development of various infrastructure projects which are badly needed by the relocatee population." *Id.* at 10. In addition, "[i]nteragency coordination and cooperation is further necessitated by the fact that the ONHIR is not a permanent entity, and ongoing functions will eventually be assumed by permanent agencies." *Id.* at 44.

81.     The 1990 Update also reported that "provision of adequate infrastructure support (water, wastewater disposal, and power) is essential to the successful relocation of families" on-

reservation. *Id*. at 59. The 1990 Update then documented numerous Chapters for which ONHIR funded infrastructure projects for relocatees, including water, wastewater, and electricity in Hardrock, Piñon, Low Mountain, and Whippoorwill Chapters, electricity in Jeddito, White Cone, and Beshbito, and roads and utilities in a Tuba City subdivision. *Id*. at 59-60. In addition, for the New Lands, ONHIR had funded construction of a school building for classrooms and a cafeteria. *Id*. at 152. However, the Navajo Nation explicitly took "responsibility for operation and maintenance once these [public service] facilities are constructed." *Id*. at 153.

82.     ONHIR also reported that it required that all relocation homes be connected to water and served by electricity to be considered "decent, safe, and sanitary housing," as required by the Relocation Act. *Id*. at 123, 128; *see also* 25 C.F.R. §§ 700.55(a)(3), (8) (requiring same). Thus, families could not move to the New Lands until water and electricity were available at the relocation sites. 1990 Update at 123, 128. To address that, the IHS was developing a regional water system and ONHIR funded infrastructure costs for connecting relocation homes to water and power systems. *Id*. at 123-24. ONHIR also paid for telephone service installation and service connections for the New Lands, though relocatees had to purchase their own telephones and contact the local telephone service provider for service. *Id*. at 135. The name for the new Chapter there "both refers to a place in the Navajo creation story and describes the spiritual and decision-making process ('planning with strength') involved in moving to the New Lands." *Id.* at 79.

83.     In 1991, the GAO reported that, while the 1986 relocation completion deadline had been missed, no new deadline had been set. 1991 GAO Report at 9-10. The deadline was missed "because more families than expected applied for relocation, and the Navajo reservation had insufficient land to accommodate new homesites for all the relocatees who wanted to move there. As of December 31, 1990, 1,894 families—68 percent of those eligible—had relocated." *Id.* at 1-

2; *see* 2014 DOI Report at 6 (explaining missed deadline due to nearly four times expected relocatees, substandard replacement housing, off-reservation adjustment, and shortage of suitable relocation land); S. Rep. No. 109-206, at 7 (noting additional factors contributing to slow pace of relocation). The GAO also reported that ONHIR had paved primary roads and funded construction of a new chapter house and community center and a high school building at the New Lands and had developed a new subdivision for Navajo families near Tuba City. 1991 GAO Report at 15-17.

84.     In 1994, the last Presidentially appointed Commissioner for ONHIR resigned, after delegating fully operational authority to its Executive Director. 2018 GAO Report at 9-10. In 1995, GAO further reported on the relocation program. GAO, Navajo-Hopi Relocation Program, GAO/RCED-95-155R (April 27, 1995) ("1995 GAO Report"). The GAO reported that Congress was concerned about the seemingly slow pace of relocations and that the relocation process was lengthy and limited by available homesites. *Id*. at 1, 6.

85.     In 1996, Congress enacted the Navajo-Hopi Land Dispute Settlement Act of 1996. Pub. L. 104-301, 110 Stat. 3649 (1996) (codified at 25 U.S.C. §§ 415(c)-(d) and 25 U.S.C. § 640d note). That ratified a Navajo-Hopi settlement and authorized Hopi to lease to Navajos remaining on HPL for 75 years, 25 U.S.C. § 415(c). At that time, 4,432 families had applied for relocation benefits, with 3,373 certified eligible, 2,730 received benefits, and approximately 643 eligible families remained awaiting benefits. S. Rep. 104-363, at 5. Thereafter, ONHIR provided another relocation application period, from April 1997 to March 2000. 2018 GAO Report at 18 & n.30.

86.     On multiple occasions over the years, members of Congress expressed concerns about the duration and cost of relocation. 2014 DOI Report at 1, 6-7; *e.g.*, S. Hrg. No. 109-183, at 1 (Statement by Senator McCain). On at least two occasions, in 1996 and 2005, Congress considered but did not enact bills to set an end date for relocation and abolish ONHIR and transfer

its functions to DOI. 2014 DOI Report at 1, 7 (referencing S. 2111 in 104th Congress and S. 1003 in 109th Congress); *see also* S. Hrg. 104-697 (1996) (concerning S. 2111). However, transferring relocation to another agency would likely increase program costs and further delay completion of relocation. 2014 DOI Report at 12. During consideration of the 2005 legislation, it was noted that the cost of the federal relocation program over the preceding 36 years was almost half a billion dollars and over ten times as much as Congress had estimated in 1974, but equivalent to what the United States was then spending in Iraq every 36 hours. S. Hrg. No. 109-183, at 1, 2, 58-59, 68.

**B.**  **Recent Relocation Implementation, Issues, And ONHIR Closure Preparations**

87.    In 2014, 40 years after the Settlement Act and 28 years after the relocation deadline, DOI reported that all Navajo and Hopi households had relocated off partitioned land (except Navajo resisters and AA-Signers), but some still awaited eligibility determinations and some eligible families still awaited relocation benefits. 2014 DOI Report at 1. Also, it would not be possible for ONHIR to complete relocation and cease operations in the near future and there was no clear completion date without legislative changes or an increase in annual appropriations. *Id*. at transmittal letter, 1, 12. Among the reasons for continuing relocation efforts, ONHIR was still performing relocation determinations and administrative appeals were not complete. *Id*. at 1. Also, the longer relocation continued, "the greater the risk that litigation might further extend its life." *Id*. For example, the Administrative Procedure Act allows six years for court appeals from benefits denials and a decision in one such appeal had led to reopening benefit application submissions through August 2010, resulting in about 3,000 additional applications. *Id*. at 4 n.2, 9-10.

88.    In 2016, DOI reported that there were opportunities for streamlining the relocation process but not ONHIR's administrative appeals. DOI OIG, Report on ONHIR's Eligibility and Relocation Practices, No. 2015-WR-067 (Feb. 17, 2016) ("2016 DOI Report") at transmittal letter,

1, 4. In particular, the relocation process could be expedited by taking advantage of the Nation's ability to lease its lands without seeking approval from the BIA. *Id*. at 1, 5.

89.     In 2018, the GAO again reported on ONHIR. 2018 GAO Report. As of December 2017, more than 3,800 households had been certified as eligible for relocation benefits. 2018 GAO Report at summary, 1, 16. Of those households, 3,660 Navajo families and 27 Hopi families, for a total of about 16,700 individuals, had been relocated off partitioned lands and provided new houses. *Id*. at summary, 1. About 99 percent of all relocated households were Navajo, and all Hopis had been relocated. *Id*. at 7 & n.7. However, ONHIR continued to carry out its responsibilities three decades after the 1986 deadline for completing relocation, and those activities would continue into the future, though ONHIR had projected that it would complete its work by the end of FY2018. *Id*. at summary, 1-2. ONHIR still needed to relocate 20 certified eligible families and resolve 25 administrative appeals. *Id*. at 2. Also, at least 240 households whose relocation applications had been denied could still file federal court appeals within six years, and that litigation might result in further eligibility decisions, as well as further home construction and warranty service. *Id*. at summary, 15, 23, 34.

90.     Furthermore, ONHIR believed it had substantially completed its responsibilities and "stated its intent to close" by September 2018 and had prepared a closure implementation plan despite not having authority to close and not taking required steps to facilitate its closure. *Id*. at summary, 53. Namely, ONHIR had not provided information to facilitate a determination by the President that ONHIR's functions had been fully discharged, as required for ONHIR to cease operations. *Id*. at summary, 35-36; *see* 25 U.S.C. § 640d-11(f). ONHIR also had not compiled key information about its activities necessary for any transition, either in its March 2017 draft transition plan or its October 2017 supplemental closure implementation plan. 2018 GAO Report at

summary, 10, 36-39. Also, while ONHIR had identified potential successor agencies, the Relocation Act did not authorize transferring ONHIR's functions to other agencies, which DOI's BIA had acknowledged. *Id*. at summary, 39-41, 53.

91.     Next, in 2019, DOI started issuing a series of reports "to help decisionmakers plan for . . . . the closure and transfer of ONHIR to [DOI] or other successor agency (or agencies)." DOI OIG, ONHIR Background & Functions, Report No. 2019-WR-039, at 1 (Dec. 2019). ONHIR's responsibilities include eligibility decisions and appeals, relocations, post-move counseling, relocation home warranties, 14 buildings, and New Lands grazing, leases, and rights of way. *Id.* at 5. Also, there was a disagreement between the Nation and the federal government regarding whether ONHIR was responsible for about $227 million in infrastructure needs for relocatees. *Id.* at 5-6. Additionally, ONHIR had worked for years on closure scenarios and strategies but did not intend to request that the President determine that ONHIR's functions have been fully discharged, as required for ONHIR's closure under the Relocation Act. *Id.*

92.     In 2020, DOI issued three more reports to facilitate ONHIR's closure, regarding relocation benefits, eligibility appeals, and New Lands selections. DOI OIG, Status of ONHIR's Admin. of Relocation Benefits, Report No. 2020-WR-016-A (Sept. 29, 2020) ("2020 DOI Benefits Report"); 2020 DOI Appeals Report; DOI OIG, Status of ONHIR's Land Selection in Arizona and New Mexico, Report No. 2020-WR-016-C (Sept. 29, 2020) ("2020 DOI Selection Report").

93.     For benefits, DOI reported that relocations for all but one Hopi individual certified as eligible were completed in 2013 and that case was closed in 2004. 2020 DOI Benefits Report at 3. For Navajos, five families certified as eligible for benefits still needed or were in process to procure relocation homes and 85 families certified as eligible for benefits had cases closed but still might receive benefits. *Id.* at 4-5. DOI also reported that ONHIR requires that all relocation homes

in Arizona be warrantied for two years after construction, that ONHIR performs warranty inspections and resolves warranty disputes on the reservations, and that home repairs are warrantied for one year. *Id.* at 5. Additionally, 14 home warranties remained outstanding but there could be over 200 more from eligible families and active and potential benefits appeals. *Id.* Nonetheless, ONHIR stated that it had "fulfilled the duties it was legislatively assigned by providing relocation benefits to all individuals who were found eligible and that other services such as infrastructure should be provided by another permanent agency." *Id.* at 8.

94.    For appeals, DOI reported that ONHIR had eight pending judicial appeals of ONHIR's benefits eligibility determinations concerning 13 families as of June 2020. 2020 DOI Appeals Report at 3 & n.3. In addition, 189 benefits denials were eligible for appeal because the six-year statute of limitations had not expired. *Id.* If ONHIR closed, its ongoing litigation would require a successor agency to be responsible for any appeals and to reconsider and perhaps provide benefits resulting from any determinations reversed or vacated and remanded. *See id.* at 4.

95.    For New Lands selections, DOI reported that, as of March 2020, 387,448 acres of the 400,000 acres of New Lands authorized for transfer and acquisition under the Relocation Act had been selected, leaving 12,552 acres remaining for selection by ONHIR. 2020 DOI Selection Report at 4-5; *see id.* at 2-3 (reviewing statutory terms). Also, there was a March 2026 deadline for the Nation to reselect up to 15,000 acres of BLM lands in New Mexico to replace prior land selections that Congress had cancelled in 2019. *Id.* at 5-6. In contrast, there is no deadline for remaining New Lands selections under the Relocation Act. *See* 25 U.S.C. § 640d-10(a)-(c).

## C.    Current Relocation Status

96.    As of ONHIR's most recent monthly status report, in July 2021, so far almost 3,700 Navajo families including over 16,000 people have been relocated from HPL. *See* July 2021

ONHIR Status Report. July 2021 was the 35th anniversary of the statutory deadline to complete relocation. *See* 25 U.S.C. § 640d-13(a); 1991 GAO Report at 9-10. However, relocation still has not yet been completed and significant issues and work remain outstanding to complete relocation.

97.     In this, ONHIR still has existing or potential relocation obligations under the Relocation Act for hundreds of Navajo families, including recent relocatees, certified applicants, remanded applicants, and denied applicants with appeals or appeal rights. *See, e.g.,* July 2021 ONHIR Status Report; 2018 GAO Report at 7, 24-26, 33-34; 2020 DOI Appeals Report at 3-4 & n.3. ONHIR also still must and has committed to provide "adequate infrastructure . . . essential to the successful relocation of families" and which is "badly needed by the relocatee population" on the Navajo Reservation. 1990 Update at 10, 59. ONHIR still has recognized that it is required to provide infrastructure for on-reservation relocatees in its governing OMM and in the Relocation Plan, in accordance with which the relocation was required to be completed 35 years ago. *See* 25 U.S.C. § 640d-13(a); Relocation Plan at 4, 235-37, 270, 278; 25 C.F.R. § 700.219(a). That includes providing community facilities and services, such as water, power, sewers, roads, schools, and health facilities, for the New Lands fully and for other areas of the Navajo Reservation "in proportion to the number of relocatees living in or moving to the areas to be served." OMM §§ 1530 at 1, 1645.41.1 at 15, 1820 at 1; *see* Relocation Plan at 4, 278.

98.     In turn, DOI continues to prepare reports on various issues regarding ONHIR to prepare for closure of ONHIR and transfer of its functions to DOI or elsewhere. At the same time, DOI at ONHIR's request is assisting ONHIR with record-keeping and accounting issues via DOI's Interior Business Center. However, DOI has not provided reasonable assistance to help ONHIR complete relocation in accordance with the Relocation Plan as required under the Relocation Act. *Cf.* 25 U.S.C. § 640d-11(e). That is even though ONHIR's predecessor had planned to coordinate

with other federal agencies to address employment, roads, utilities, and similar needs, 1983 Update at 35-36, and ONHIR has long recognized that "[i]nteragency coordination and cooperation is . . . necessitated by the fact that the ONHIR is not a permanent entity[,]" 1990 Update at 44.

99.     The Nation, the Hopi Tribe, and the BIA have long opposed transfer of relocation responsibilities from ONHIR to BIA because of the BIA's existing duties to both tribes, its prior overburden and underfunding, and its lack of relevant expertise, and because a transfer could further delay relocation. S. Hrg. No. 109-183, at 62, 65, 71, 79, 81, 158-59. The GAO also has confirmed that transferring relocation to another agency likely would increase program costs and further delay completion of relocation. 2014 DOI Report at 12.

## VI.     RELOCATION IMPACTS

### A.     Human Impacts

100.     The relocation of over 16,000 Navajos from their ancestral homes on HPL has imposed devastating impacts on relocatees and their descendants, as well as surrounding communities. Relocatees were generally informed and promised that they would be moved to similar locations with better circumstances, for the same or easier, more comfortable lives, without much hardship. But that did not happen. Instead, the Navajo relocation program has been carried out in apparent ignorance of lessons from prior forced relocations of Navajos and others, as well Navajo economic production, subsistence practices, residence patterns, and land tenure. *See* 2018 GAO Report at 65; 1974 Senate Hrg. at 256-57, 281, 286; Tamir, 59 Applied Anthropology at 271.

101.     In this relocation, Navajo families were uprooted from their traditional hogans, communities, and ways of life, lost their livelihoods via forced livestock reduction by DOI, and were mostly placed in unfamiliar lands, often far from their clans and extended families. This has included greater exposure to non-Navajo culture, racism, and problems, as well as greater

difficulties in practicing and continuing Navajo culture and traditions. Also, many relocatees have been forced to shift from sustainable, subsistence lives to dissimilar Western economies without marketable skills, training, education, experience, or abilities to pay for provisions, utilities, or maintenance for modern houses, resulting in substantial financial and residential instability.[8] Relocatees were compensated for their homes and improvements, but not for their loss of land and resources, and their replacement homesites were not adequate to continue traditional Navajo lives and practices. Tamir, 59 Applied Anthropology at 270.

102.    Many relocatee families have suffered intense intergenerational trauma, and these impacts will remain with the Navajo Nation for many generations to come, S. Hrg. No. 109-183, at 66. This includes acute alienation, anxiety, stress, and disorientation caused by dispossession and displacement from traditional homesites, lands, lives, livestock, and livelihoods, undermined independence to provide for families, imposed federal dependency, reduced native language transmission, and increased depression, violence, illness, family breakups, and substance abuse.[9] Relocatee descendants face no ancestral lands to return to, limited housing for their own families,

---

[8] *See, e.g.,* 2018 GAO Report at 110-13 (Navajo letter); Navajo Nation Human Rights Comm'n, Public Hrg. Report: The Impact of the Navajo-Hopi Land Settlement Act of 1974 at i, 1-2 (July 2012) (noting testimony on relocation impacts); S. Hrg. No. 109-183, at 67, 91-95, 105, 130-43 (same, including Special Report on Navajo Relocation by the NHLCO); Tamir, 59 Applied Anthropology at 268; Initial Findings of Intergov'tl Relations Committee ("IGRC") & NHLC, attached to Navajo Nation Council IGRC, Res. IGRD-294-94 (Oct. 9, 1994) (same); Whitson, 27 Ariz. L. Rev. at 385, 387 (also noting other impacts); 1985 Hearing at 283-85 (testimony of Navajo Chairman Peterson Zah).

[9] *See id.* at 66-67; Aresta Tsosie-Paddock, Second-Generation Navajo Relocatees: Coping with Land Loss, Cultural Dispossession, and Displacement, 33 Wicazo Sa Review 87, 92-94, 109 (2018); Orit Tamir, We Find Ourselves in the Middle: Navajo Relocation and Relocatee-Host Conflicts, 31 Practicing Anthropology 35, 39 (Spring 2009); Tamir, 59 Applied Anthropology at 267-68 (citing numerous prior studies).

limited lands for livestock, and disrupted and diminished opportunities for both ceremonial practices and intergenerational transfer of *Diné* language and traditions. *See* Tsosie-Paddock, *supra*, at 95-96, 99-101, 103-04, 106-10.

103.    These issues and impacts also include stresses on Navajo communities that have accepted relocatees, especially areas adjacent to HPL, and even including close relatives. Tamir, 31 Practicing Anthropology at 36-38; NHLC, *E'e'aahjí Diné Bikéyah Náhiilnaah Bánahat'á*, Rehabilitation Planning for Western Navajo Land (Oct. 31, 1994) (c.k.a. Western Area Regional Plan ("WARP") Update) at 37, 41; 1985 Hearing at 284, 355-56, 403. This situation exists because housing on the Navajo Reservation was already scarce and overcrowded. *E.g.*, NHIRC Investigation, reprinted in 1985 Hearing at 326. Thus, almost 40% of houses within the remaining NPL have had more than two families, over 90% of NPL houses have lacked telephone service, about 80% have not had complete plumbing, about 70% have lacked complete kitchen facilities, and most lack running water, are accessible only by dirt tracks, and are located 20 to 70 miles from schools and over 40 miles from a hospital and police assistance. S. Hrg. No. 109-183, at 95, 97-99. Those issues have been as bad or worse for the area of the Navajo Reservation located immediately west of the 1882 Reservation, which was subject to a federal construction freeze from 1966 to 2009. *See* WARP Update at 38, 41-68; S. Hrg. No. 109-183, at 67, 95-99; *Navajo Nation v. United States*, 631 F.3d 1268, 1270-71 (Fed. Cir. 2011) (discussing freeze); Pub. L. 111-18, 123 Stat. 1611 (2009) (repealing freeze previously codified at 25 U.S.C. § 640d-9(f)).

104.    These issues also have been especially acute for Navajos who have not yet received and may not ever receive federal benefits to pay for relocation housing. *See* Whitson, 27 Ariz. L. Rev. at 408-09; *supra* note 3 and accompanying text. Among others, that includes those who were minors when they or their families moved from HPL. *See* WARP Update at 29, 37, 40; S. Hrg.

No. 109-183, at 95. Like others, they have been subject to livestock reductions and seizures and forced to move from traditional homes, but without replacements. They since have been refugees, sometimes homeless, often in substandard, overcrowded conditions, indefinitely awaiting possible relocation benefits. S. Hrg. No. 109-183, at 92, 105, 132, 139. The average time from application to receiving relocation benefits is 7.9 years without appeals. 2018 GAO Report at 17. Where administrative appeals are involved, the average wait for relocation is 13.5 years. *Id.*

105.     Early studies correctly predicted that the expected outcome of Navajo relocation would be notably detrimental, Tamir, 59 Applied Anthropology at 267 (citing studies in 1981, 1982, and 1985), and federal officials have long known about these myriad problems. In 1979— now over four decades ago—it already was "apparent that the impact of relocation will be quite severe, particularly for certain elderly Navajos whose families have lived for generations" on HPL. S. Rep. No. 96-373, at 2 (1979). In 1981, in its first statutorily required report, the NHIRC noted the "adverse social, economic, cultural, and other impacts of relocation[,]" as well as "the poor state of economic development on the [Navajo] reservation[,]" and the limited employment opportunities there. Relocation Plan at 108. In 1982, the NHIRC reported to Congress on problems faced by many relocatees, and one of Arizona's Senators acknowledged "the harsh and negative impact relocation will have on most of the potential relocatees . . . and the impact of relocation on the bordering communities," 128 Cong. Rec. S27,093 (Oct. 1, 1982) (Sen. DeConcini statement). In 1983, the NHIRC recognized the challenges, uncertainties, and anxieties placed on relocatees and the impact of relocatees on local communities and community resources including schools and hospitals. 1983 Update at 43, 65-66.

106.     In 1985, a congressional report to the NHIRC noted numerous issues with relocation and identified a key problem as follows:

> Relocation, as the name might imply, is not simply a matter of changing residence. To the traditional Navajo family it is the end of a way of life. Most of these relocatees families will leave their small, one-room hogans and meager number of sheep to move into modern, multiroom homes. The more acculturated Navajo will be further propelled into a life toward which many were already headed but not yet prepared to live. It is clear to anyone familiar with the situation that relocation is complicated and can be tragic.

NHIRC Investigation, reprinted in 1985 Hearing at 337. These issues have not improved over time.

107.    In 1991, the GAO reported that 54% of about 1,000 families awaiting relocation surveyed by ONHIR in 1987 lived in inadequate homes and 35% had home maintenance and repair problems. GAO, Navajo-Hopi Resettlement Program, RCED-91-105BR, at 3 (March 1991). By 2005, the relocation program had destroyed the subsistence lifestyle of thousands of Navajos, uprooted whole communities on ancestral lands with deep spiritual ties, and left the Nation, its people, and their communities to bear the burden of addressing the extraordinary economic, social, and psychological consequences of relocation. S. Hrg. No. 109-183, at 66-67, 90-95, 104-05. These profound problems for relocatees, refugees, and their Navajo communities still exist and continue to be noted. *See, e.g.,* 2018 GAO Report at 108-13 (Navajo letter).

**B.    Infrastructure Impacts**

108.    All the above severe impacts on on-reservation Navajo relocatees, refugees, and host communities are exacerbated by the continuing federal failure to provide the required related community facilities that are essential for a thorough and generous federal relocation program to avoid repeating the problems of prior Navajo and other Indian relocations, as Congress intended and required in the Relocation Act, as ONHIR acknowledged in the Relocation Plan and its governing OMM, and as ONHIR promised in inducements for relocatees. As early as 1990, ONHIR acknowledged that Navajo community facilities and services were subjected to the additional strain of serving relocatees. 1990 Update at 63. These problems continue today.

47

109.     For example, at NDC, there are substantial infrastructure problems. This includes water distribution pipes that are too small, resulting in very, very low water pressure. This has obstructed developing additional housing and community facilities and impeded local economic development. Also, water tanks are aging and bad water pumps are breaking. There is a major problem with either no fire hydrants or no water to fire hydrants for most of the housing. In addition, a school was built by ONHIR but is no longer in use because of structural issues. NDC also needs funding for youth, senior, and law enforcement facilities. Currently, there are no emergency services located within the Chapter, so residents needing those services often have to travel hours or wait days for emergency services.

110.     Numerous additional Navajo Chapters where substantial relocatees also have been relocated also have substantial needs for additional or improved community facilities and services to accommodate relocatees. Those Chapters include without limitation Black Mesa, Coalmine Canyon, Dilkon, Forest Lake, Fort Defiance, Indian Wells, Jeddito, Kayenta, Leupp, Low Mountain, Piñon, Shonto, Teesto, Tolani Lake, To'Nanees'Dizi (f.k.a. Tuba City), Tonalea/Red Lake, Tsé Dildó'ii (a.k.a. Hard Rock), Tsidii To'ii (f.k.a. Cottonwood), Whippoorwill, and White Cone. For example, Coalmine Canyon, Tolani Lake, and Tonalea Chapters need either new chapter houses or existing facilities renovated to accommodate their community needs. Tonalea needs various safety, fire, and law enforcement facilities and services.  Coalmine Canyon, Leupp, Tolani Lake, and Tonalea Chapters all need various power and electric lines, extensions, and services. Coalmine Canyon, Leupp, and Tolani Lake all need various waste, water and sewer facilities, infrastructure, and services. Coalmine Canyon, Leupp, Tolani Lake, and Tuba City need various youth and senior care facilities. Virtually all the Chapters noted above need road infrastructure.

111.    For example, many relocatees and their own or host communities have to rely on extensive unpaved roads that are in poor condition. Road conditions in winter require hours of travel for basic household or living needs. This causes problems for not just everyday life, work, and school, but also emergency and governmental access, as shown here:






112.    Also, many relocatees live in homes with no indoor plumbing or ready access to potable water supplies, forcing them to haul water for their daily use. This has especially caused problems during the pending pandemic. *See, e.g.,* Desi Rodriguez-Lonebear *et al.*, Am. Indian Reservations and COVID-19: Correlates of Early infection Rates in the Pandemic, 26 J. of Pub. Health Mgmt. & Practice 371 (July/Aug. 2020); Simon Romero, Checkpoints, Curfews, Airlifts: Virus Rips Through Navajo Nation, N.Y. Times (April 20, 2020). Many relocatees also raise livestock, in continuation of traditional practices, but those also need and lack adequate access to naturally fed watering ponds or troughs supplied by wells and windmills or other sources.

49

113.    Many additional relocatee community facilities needs abound despite layers of federal commitments under the Relocation Act. Many communities with many relocatees lack sufficient electricity or appropriate septic or sewer systems. These issues are especially problematic for elders during cold winters. There also are inadequate schools in many relocatee areas, requiring students to commute hours over poor roads to receive their education. Many areas, especially within the Tsé Dildó'ii (a.k.a. Hard Rock), Black Mesa, and Piñon Chapters that have been greatly impacted by relocation, have little or no ground or mobile telephone (or internet) service. This hampers work, education, and emergency services. Finally, many Chapters seriously impacted by relocation lack adequate access to health and emergency facilities, which places all lives there at greater risk. For example, in Tsé Dildó'ii (a.k.a. Hard Rock), the nearest health facilities are 25 miles away and the nearest police station is 65 miles away.

## C.    Financial Impacts

114.    The financial impacts of relocation for individuals relocatees, benefits applicants, refugees, and their communities are immense and ongoing. Those for the Nation are also great, especially in past and impending costs to address federal failures to provide necessary and promised community facilities for relocatees at their relocation sites. Overall, the Nation has enumerated almost $227 million in outstanding relocatee community infrastructure needs directly tied to relocation. 2018 GAO Report at 125. As just one example among many others, the Nation in August 2021 appropriated $19.5 million to pave existing dirt roads between the Nation's Hard Rock and Piñon Chapters. Those Chapters have had substantial increases in populations from Navajos that were forced to relocate per the Relocation Act, but for whom ONHIR without reasonable assistance from DOI or otherwise has failed to provide roads.

115.    The Nation likewise is currently facing a pressing need to spend over $12 million for road improvements in To'Nanees'Dizi (f.k.a. Tuba City) Chapter, which is the largest local community in that area of the Navajo Reservation and has largely served as a refugee area for many who have received or have been long seeking and awaiting relocation benefits. Many similar road needs and impending expenses for the Nation exist within numerous other Chapters because of increased populations due to relocation.

116.    The Nation also is facing a pressing need to pay over $100 million for a powerline extension for the Coalmine Canyon Chapter, the population of which was substantially relocated from the former Coalmine Mesa Chapter, *see* 1983 Update at 68. Similarly, $675,000 is needed to pay for a powerline extension in Tolani Lake. Other Chapters with substantial relocatee populations have similar needs.

117.    Likewise, over $20 million is needed for Chapter Houses—essentially, community centers, which are absolutely necessary in small, remote communities—in each of Coalmine Canyon, Leupp, To'Nanees'Dizi, and Tonalea Chapters. For example, the Coalmine Canyon Chapter House is completely unusable and requires replacement because of settling caused by ONHIR's improper design, site preparation, and construction.

118.    Currently, $3.5 million is needed for youth, senior, and law enforcement facilities in the NDC, which was specifically established on New Lands acquired in trust under the Relocation Act to accommodate relocatees, who constitute the vast majority of its population. *See* 1990 Update at 73-157 (addressing relocation to the New Lands).

119.    The Nation will continue to incur many millions of dollars for relocatee community facilities in many Chapters unless ONHIR, with reasonable assistance from DOI and other federal

agencies if necessary, promptly and properly completes relocation as required under the Relocation Act before ONHIR closes without authorization under the Relocation Act.

## VII.   CLAIMS FOR RELIEF

**Claim 1.      Failure Of ONHIR To Provide Community Facilities And Services For Navajo Relocatees**

120.     The Nation realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

121.     This Court has authority under the Declaratory Judgment Act to "declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201(a), including clarifying and settling the legal relations in issue and to terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding, particularly where a law establishes specific federal duties.

122.     If a declaratory judgment is issued, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202. Therefore, a declaratory judgment can be used as a predicate for further relief, including an injunction.

123.     As described above, the relocation of Navajos under the Relocation Act shall take place in accordance with the Relocation Plan. 25 U.S.C. § 640d-13(a). The Settlement Act mandate to assure community services and facilities was expressly confirmed and implemented in the Relocation Plan, implicitly reaffirmed in the 1988 Amendments, and is still also recognized in the OMM for both the New Lands and other affected Chapters.

124.     Under the Relocation Act, the Relocation Plan, and the OMM, ONHIR has been ordered and mandated and has committed to develop for relocatee households at their relocation sites community facilities and services, such as water, sewers, roads, schools, and health facilities,

as well as power, telephone, and other utilities, all of which are essential for successful relocation. That includes providing all such community facilities at the New Lands, which is wholly populated by relocatees and their families, and participating in infrastructure projects on other Chapters of the Navajo reservation in proportion to the number of relocatees living in or moving to those Chapters. OMM § 1530 at 1; *id.* § 1645.41.1 at 15.

125.    Those duties are reinforced by promises that the NHIRC and then ONHIR made to relocatees and host communities on the Navajo reservation to induce relocation, and upon which relocatees and host communities have substantially relied.

126.    Those duties also are reinforced by the United States' "affirmative . . . fiduciary obligation" to all Navajo citizens who were required to relocate from Hopi lands to assist them in receiving "the maximum benefits" under the Relocation Act, as presaged in *Kabinto*, 456 F.2d at 1092, and expressly confirmed in *Bedoni v. ONHIR*, 878 F.2d 1119, 1124-25 (9th Cir. 1989).

127.    ONHIR, either on its own or in conjunction with DOI or other federal agencies, has failed to provide necessary community facilities for Navajo relocatees in violation of fiduciary obligations under the Relocation Act and as promised to relocatees as an inducement for relocation. Instead, ONHIR has asserted that it has largely completed its obligations under the Relocation Act and has sought and obtained the assistance of DOI to prepare for closure of ONHIR.

128.    Absent a declaratory judgment confirming ONHIR's obligation to provide community facilities for Navajo relocatees and injunctive relief to compel the performance of that legal obligation, the Nation and tens of thousands of its citizens across many Navajo Chapters will be immediately, continuously, and irreparably harmed by ONHIR's ongoing illegal actions.

**Claim 2.        Unreasonably Delay By ONHIR In Completing Relocation Of Navajos From Hopi-Partitioned Land**

129.    The Nation realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

130.    This Court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). That authority especially applies here, where a federal agency has been under a duty for decades, Congress has provided a specific deadline for agency action on a discrete matter, the agency has unreasonably delayed discharging its duties, and delaying review would harm human health and welfare and unduly prejudice plaintiffs' rights.

131.    The 35-year delay here beyond an express statutory deadline for completion of relocation, 25 U.S.C. § 640d-13(a), is categorically unreasonable. No agency may so extensively violate such an explicit statutory deadline by more than a generation, and no reasons for the delay in properly completing relocation justify the ongoing violation of that statutory deadline.

132.    This extreme delay is also unreasonable because it fundamentally concerns human health and welfare. It is especially acute because it concerns federal relocation of over 16,000 Navajos from their ancestral homelands. 2018 GAO Report at summary, 1, 7 & n.7. Those relocatees, refugees, and their host communities all have been and continue to be severely impacted by ONHIR's unreasonable delay.

133.    ONHIR's delay in completing Navajo relocation under the Relocation Act is also unreasonable because it concerns basic human issues that Congress required the United States to handle. *See, e.g.,* 2018 GAO Report at summary, 2, 15, 20-28; 2016 DOI Report at transmittal letter, 7-8, 15-16. It is irrelevant whether any impropriety lurks behind ONHIR's delay. ONHIR especially should have known and worked to "avoid a repetition of the unfortunate results of a number of early, official Indian relocation efforts" as Congress intended. S. Rep. 93-1177, at 20.

134.    Furthermore, expediting delayed relocation should not unduly affect other ONHIR activities of a higher or competing priority, since ONHIR's basic function concerns relocation, *see* 25 U.S.C. §§ 640d-13, -14, as its very name indicates, *id.* § 640d-11(a). Also, to the extent that ONHIR itself has difficulty or insufficient funding to promptly and properly complete relocation, ONHIR possesses explicit statutory authority to call upon other departments and agencies for assistance, which must provide reasonable assistance so requested. *See id*. § 640d-11(e)(1).

135.    Finally, the nature and extent of interests prejudiced by ONHIR's unreasonable delay in completing relocation are extreme. That includes over 16,000 already relocated Navajos and over 33,000 other Navajos within their communities who remain severely impacted by waiting decades for provision of essential community facilities and services for relocatees. That also includes thousands of Navajo refugees and current and potential appellants waiting decades for relocation benefits and replacement housing and related community facilities and services.

136.    All these material equitable considerations and public interests support declaring that ONHIR has unreasonably delayed completion of relocation of Navajos from Hopi lands and granting injunctive relief to advance prompt, proper completion of Navajo relocation.

137.    Absent a declaratory judgment confirming ONHIR's unreasonable delay in completing relocation of Navajo citizens and injunctive relief to compel the performance of that long-overdue legal obligation, the Nation and over 50,000 of its citizens spread across many Navajo Chapters will continue to be immediately, continuously, and irreparably harmed by ONHIR's ongoing illegal actions.

**Claim 3.      Failure By ONHIR To Fully Discharge Its Functions Before Working To Close**

138.    The Nation realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

139.    The Relocation Act established the NHIRC and ONHIR as its successor as an independent entity in the Executive Branch, which "shall cease to exist when the President determines that its functions have been fully discharged." 25 U.S.C. §§ 640d-11(a), (i).

140.    ONHIR has stated an intention to close, has developed plans for that, and has actively worked to prepare for closure. However, ONHIR still has much work to do to complete relocation and has not provided information that could facilitate a determination by the President that ONHIR's functions have been fully discharged, as required for ONHIR to cease operations, and no other federal department or agency possesses authority to undertake ONHIR's activities.

141.    All material equitable considerations and public interests support declaring that ONHIR has not fully discharged its functions and may not cease to exist unless and until there is a Presidential determination that ONHIR's functions have been fully discharged, and granting injunctive relief to prevent premature and unauthorized closure of ONHIR.

142.    Absent a declaratory judgment confirming that ONHIR has not fully discharged its functions, and injunctive relief to prevent ONHIR from closing before the President determines that ONHIR has full discharged its functions, the Nation and over 50,000 of its citizens across many Navajo Chapters will continue to be immediately, continuously, and irreparably harmed.

**Claim 4.    Failure By ONHIR To Obtain And DOI To Provide Reasonable Interagency Assistance In Implementing The Relocation Plan**

143.    The Nation realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

144.    Congress expected that other agencies would assist in implementing relocation, and the Relocation Act authorizes ONHIR to call upon any department or agency to assist in implementing the Relocation Plan, provided that control over and responsibility for completing

relocation shall remain with ONHIR and that any department called upon by ONHIR shall provide reasonable assistance so requested. 25 U.S.C. § 640d-11(e).

145.   ONHIR and its predecessor have recognized the necessity for interagency assistance to complete relocation, especially regarding provision of necessary community facilities for relocatees, and affirmed that they will call for the assistance of DOI and other agencies as necessary to implement relocation. ONHIR also has called upon other federal agencies to assist in implementing relocation, including IHS. However, ONHIR either has unreasonably failed to call upon other agencies to fulfill that necessity or unreasonably failed to require that such requested reasonable assistance be provided.

146.   Instead, ONHIR has called upon DOI to assist in addressing ONHIR's recordkeeping and accounting issues and DOI has volunteered assistance in planning for the closure of ONHIR without a legally required Presidential determination that ONHIR's functions have been fully discharged or any factual basis on which such a determination could be made.

147.   All material equitable considerations and public interests support declaring that ONHIR must obtain and that DOI must provide reasonable assistance to support implementing the Relocation Plan rather than working to close ONHIR prematurely without legal authorization.

148.   Absent a declaratory judgment confirming that ONHIR must obtain and DOI must provide reasonable assistance to implement the Relocation Plan, and injunctive relief to require performance of those obligations, the Nation and over 50,000 of its citizens spread across many Navajo Chapters will continue to be immediately, continuously, and irreparably harmed.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Navajo Nation asks for a judgment in favor of it and its affected citizens and against Defendants as follows:

1. the Navajo Nation and its affected citizens have suffered irreparable injuries; remedies available at law, such as monetary damages, are inadequate to compensate for those injuries; considering the balance of hardships between the Nation and Defendants, remedies in equity are warranted; and the public interest would not be disserved by a permanent injunction;

2. declare that ONHIR has unreasonably delayed completion of relocation of Navajo citizens from Hopi-partitioned land within the 1882 Reservation in accordance with the Relocation Plan as required by the Relocation Act, 25 U.S.C. § 640d-13(a), including without limitation provision for relocatees at their relocation sites of community facilities and services, such as water, power, telephone, sewers, roads, schools, and health facilities;

3. declare that ONHIR has failed to obtain and DOI has failed to provide reasonable assistance to implement the Relocation Plan as required by the Relocation Act, *id.* § 640d-11(e), and relevant circumstances;

4. declare that ONHIR has not fully discharged its functions and may not attempt to close or otherwise cease operations or to exist unless and until the President determines that ONHIR's functions under the Relocation Act have been fully discharged, *id.* § 640d-11(f);

5. compel ONHIR under the APA to promptly complete unreasonably delayed relocation per the Relocation Plan under the Relocation Act, *see* 5 U.S.C. § 706(1); 25 U.S.C. § 640d-13(a), including without limitation completion of benefits eligibility determinations, land selections, provision of individual or family relocation benefits, and provision for relocatees at their relocation sites of community facilities and services, such as water, power, telephone, sewers, roads, schools, and health facilities;

6. compel ONHIR to obtain and DOI to provide reasonable assistance to implement the Relocation Plan per the Relocation Act, 25 U.S.C. § 640d-11(e), rather than work to close

ONHIR before ONHIR has fully discharged its functions, as precluded by the Relocation Act, *id.* § 640d-11(f);

7.     include a strict timeline for action by ONHIR and DOI with specific deadlines subject to modification based only on new information showing that modification is required, with the Court retaining jurisdiction to ensure compliance pending completion of relocation;

8.     award costs for the Plaintiff; and

9.     any and all other relief the Court may deem proper and just.

Dated: August 24, 2021

Respectfully submitted,

/s/Daniel I.S.J. Rey-Bear
Daniel I.S.J. Rey-Bear*
Timothy H. McLaughlin*
Rey-Bear McLaughlin, LLP
421 W Riverside Ave, Suite 1004
Spokane, WA 99201-0410
telephone: 509-747-2502
dan@rbmindianlaw.com
tim@rbmindianlaw.com

Doreen N. McPaul, Attorney General
Kimberly A. Dutcher,
    Deputy Attorney General
Office of the Attorney General
Navajo Nation Department of Justice
P.O. Box 2010
Window Rock, Navajo Nation (AZ) 86515
telephone: 928-871-6345
dmcpaul@nndoj.org
kdutcher@nndoj.org

/s/Susan I. Eastman
Susan I. Eastman
Principal Attorney/Director
Navajo-Hopi Legal Services Program
117 Main Street, P.O. Box 2990
Tuba City, Navajo Nation (AZ) 86045
telephone: 928-283-3301
seastman@nndoj.org

Christina S. West*
Tierra N. Marks*
Barnhouse Keegan Solimon & West LLP
7424 4th Street NW
Los Ranchos de Albuquerque, NM  87107
telephone: 505-938-9144
cwest@indiancountrylaw.com
tmarks@indiancountrylaw.com

*Application for admission
 pro hac vice pending.

**VERIFICATION**

On behalf of the Navajo Nation, I have reviewed and am acquainted with the facts set forth in the Navajo Nation's foregoing Verified Complaint for Declaratory and Injunctive Relief. Those facts are true and accurate to the best of my personal knowledge, information, and belief based on my personal knowledge and my extensive relevant professional experience on behalf of the Navajo Nation. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____August 21, 2021_____.


_____

Roman Bitsuie