**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Navajo Nation,

                Plaintiff,

v.

Office of Navajo and Hopi Indian Relocation, et al.,

                Defendants.

No. CV-21-08190-PCT-DWL

**ORDER**

## INTRODUCTION

The Ninth Circuit previously observed that the "more-than-a-century-old dispute between members of the Hopi Tribe and the Navajo Nation over the use of approximately 2.5 million acres in northern Arizona . . . has been the subject of extensive litigation and legislation, including at least eighteen opinions of this court." *Clinton v. Babbitt*, 180 F.3d 1081, 1083 (9th Cir. 1999). This lawsuit represents another instance of such litigation.

The background details are as follows. In 1882, President Chester A. Arthur signed an executive order that "created a 2.5 million acre reservation for the Hopi Tribe and for 'such other Indians as the Secretary of Interior may see fit to settle thereon.'" *Id.* (citation omitted). "Over the next several years, the Hopi Tribe enjoyed the right to use and occupy the 2.5 million acre reservation, but the Navajo population in the area grew substantially. Conflicting claims to exclusive use arose between the Hopi Tribe and the Navajo Nation, producing what became known as 'the greatest title problem in the West.'" *Id.* (citation omitted). "In 1958, to quiet title to the area, Congress authorized litigation between the

Hopi Tribe and the Navajo Nation.  Pursuant to that litigation, a federal district court determined that 650,000 acres of the disputed area belonged exclusively to the Hopi Tribe, and that the Hopi Tribe and Navajo Nation had joint and undivided interests in the remaining approximately 1.8 million acres, an area thereafter referred to as the 'Joint Use Area.'  Congress then directed the partitioning of the Joint Use Area in the Navajo and Hopi Indian Land Settlement Act of 1974."  *Id.* (citations omitted).  Among other things, "[t]he 1974 Settlement Act required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission to pay for the major costs of such relocations.  As of 1996, the United States had spent more than $330 million to relocate more than 11,000 tribal members."  *Id.* (citations omitted).

In this action, Plaintiff Navajo Nation ("the Nation") has sued the Office of Navajo and Hopi Indian Relocation ("ONHIR") and the U.S. Department of the Interior ("DOI") (together, "Defendants") for failing to comply with various provisions of the Settlement Act and subsequent enactments, which the Nation refers to collectively as "the Relocation Act."  (Doc. 1.)[1]  More specifically, the Nation seeks (1) declaratory relief that ONHIR "has failed to provide necessary community facilities for Navajo relocatees in violation of fiduciary obligations under the Relocation Act" and "injunctive relief to compel the performance of that legal obligation" (*id.* ¶¶ 120-28); (2) declaratory relief that "ONHIR has unreasonably delayed completion of relocation of Navajo citizens" and "injunctive relief to advance prompt, proper completion of Navajo relocation" (*id.* ¶¶ 129-37); (3) declaratory relief "confirming that ONHIR has not fully discharged its functions, and injunctive relief to prevent ONHIR from closing before the President determines that

---

[1]      The Settlement Act, *see* P.L. 93-531, 88 Stat. 1712 (1974), was previously codified at 25 U.S.C. § 640d.  However, effective September 1, 2016, § 640d of Title 25 was omitted from the United States Code as being of "special and not general application."  This omission is editorial only and has no effect on the validity of the law, and Defendants have provided a copy of the text of § 640d as an attachment to their motion.  (Doc. 20-1.)  The other components of the "Relocation Act" as alleged by the Nation (Doc. 1 ¶ 1) are the Navajo and Hopi Indian Relocation Amendments Act of 1980, P.L. 96-305, 94 Stat. 929, the Navajo and Hopi Indian Relocation Amendments of 1988, P.L. 100-666, 102 Stat. 3929, and the Navajo and Hopi Indian Relocation Commission, Report and Plan (April 3, 1981).

ONHIR has full[y] discharged its functions" (*id.* ¶¶ 138-42); and (4) declaratory relief "confirming that ONHIR must obtain and DOI must provide reasonable assistance to implement the Relocation Plan, and injunctive relief to require performance of those obligations" (*id.* ¶¶ 143-48).  Defendants have, in turn, moved to dismiss the Nation's complaint for lack of subject-matter jurisdiction and/or for failure to state a claim.  (Doc. 20.)  For the following reasons, the motion is granted in part and Defendants are granted leave to file a second motion to dismiss with respect to Count One.

## BACKGROUND

I.    Legal Developments

As noted, the Settlement Act of 1974 "required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission," now known as ONHIR,[2] "to pay for the major costs of such relocations." *Clinton,* 180 F.3d at 1084.  "The Act also provided for various payments to be made to the heads of households that were relocated," including "the fair market value of the habitation and improvements owned in the area," "actual reasonable moving expenses," "the cost of a 'decent, safe and sanitary' replacement dwelling," and "'bonus' payments to families who contracted to relocate within certain time periods after the effective date of the relocation plan." *Begay v. United States*, 16 Cl. Ct. 107, 111 (1987), *aff'd*, 865 F.2d 230 (Fed. Cir. 1988).[3]

ONHIR was established "as an independent entity in the executive branch."  P.L. 93-531 § 12(a); 25 U.S.C. § 640d-11(a).  The Settlement Act directed ONHIR to "prepare and submit to the Congress a report concerning the relocation of households and members thereof of each tribe."  P.L. 93-531 § 13(a); 25 U.S.C. § 640d-12(a).  ONHIR was instructed that the report "shall include a detailed plan providing for the relocation" and shall (1) "be developed . . . in consultation with the persons involved in such relocation and appropriate

---

[2]    ONHIR's predecessor agency was the Navajo and Hopi Indian Relocation Commission ("NHIRC").  *See* P.L. 100-666 §4(c)(1)(C)(2), 102 Stat. 3929 (1988).  For clarity, the Court will refer to NHIRC and ONHIR collectively as ONHIR.

[3]    ONHIR's provision of such benefits is, in turn, subject to review under the Administrative Procedures Act ("APA").  *Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1122 (9th Cir. 1989).

- 3 -

representatives of their tribal councils"; (2) "avoid or minimize, to the extent possible," the "adverse social, economic, cultural, and other impacts of relocation"; (3) "identify the sites to which such households shall be relocated"; and (4) "assure that housing and related community facilities and services, such as water, sewers, roads, schools and health facilities, . . . [are] available at their relocation sites." P.L. 93-531 § 13(c)(1)-(4). Congress provided that "[t]he relocation shall take place in accordance with the relocation plan and shall be completed by the end of five years from the date on which the relocation plan takes effect." P.L. 93-531 § 14(a); 25 U.S.C. § 640d-13(a). Congress also provided that ONHIR "shall cease to exist when the President determines that its functions have been fully discharged." P.L. 93-531 § 12(i); 25 U.S.C. § 640d-11(f).

The relocation plan was submitted in April 1981 and took effect in July 1981.[4] Thus, ONHIR's relocation efforts were expected to be completed by July 1986.

Congress has amended the Settlement Act several times. In 1980, Congress passed the Navajo and Hopi Indian Relocation Amendments Act, which, among other things, "authorized" ONHIR to "call upon any department or agency of the United States to assist [ONHIR] in implementing its relocation plan and completing relocation within the time required by law, except that the control over and responsibility for completing relocation shall remain in [ONHIR]." P.L. 96-305 § 5(3)(i); 25 U.S.C. § 640d-11(e). This law also provided that "[i]n any case in which [ONHIR] calls upon any such department or agency for assistance . . . , such department or agency shall provide reasonable assistance so requested," and "[o]n failure of any agency to provide reasonable assistance . . . [ONHIR] shall report such failure to the Congress." *Id.*

In 1988, Congress passed the Navajo and Hopi Indian Relocation Amendments, which, in relevant part, directed ONHIR to submit to Congress a new relocation report.

---

[4]     The parties agree that these dates are accurate. (Doc. 1 ¶ 56; Doc. 20 at 3 & n.2.) Defendants also provide a citation to the report itself, *see* Navajo and Hopi Indian Relocation Commission, Report and Plan, (April 3, 1981), *available at* https://www.onhir.gov/readingroom/, which they correctly contend may be considered at the motion-to-dismiss stage because it is referenced in the complaint. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

P.L. 100-666 § 4(d).  This law did not include the original language from the Settlement Act that directed ONHIR, when formulating the relocation report, to "assure that . . . community facilities and services, such as water, sewers, roads, schools and health facilities . . . [would] be available at [the] relocation sites."  *Compare* P.L. 100-666 § 4(d) ("Section 13 of Public Law 93-351 (25 U.S.C. § 640d-12) is amended to read as follows . . . ."), *with* P.L. 93-531 § 13(c)(4).  However, the law did retain language that ONHIR was authorized to call upon any department or agency "to assist . . . in implementing the relocation plan" and that "[n]otwithstanding any other provisions of law or any amendment made by this Act . . . [ONHIR] shall . . . have the same structure, powers and responsibilities [ONHIR] had before enactment of this Act . . . ."  P.L. 100-666 § 4(a)-(c).

In 1996, Congress passed the Navajo-Hopi Land Dispute Settlement Act, which, in relevant part, ratified a 1995 settlement agreement between the United States and the Hopi Tribe and provided the necessary "authority for the [Hopi] Tribe to enter agreements with eligible Navajo families in order for those families to remain residents of the Hopi Partitioned Lands for a period of 75 years."  *See* P.L. 104-301; S. REP. 104-363, 104th Cong. 2nd Sess. (1996).

II.   <u>Procedural History</u>

On August 24, 2021, the Nation initiated this action by filing a complaint.  (Doc. 1.)

On December 28, 2021, Defendants filed the pending motion to dismiss.  (Doc. 20.)

On March 30, 2022, the Nation filed a response.  (Doc. 25.)

On May 16, 2022, Defendants filed a reply.  (Doc. 28.)

On September 14, 2022, the Court issued a tentative ruling.  (Doc. 30.)

On September 23, 2022, the Court heard oral argument.  (Doc. 31.)

…

…

…

…

…

1

**DISCUSSION**

2 I.    Legal Standards

3        A.    **Dismissal Under Rule 12(b)(1)**

4        Courts "have an independent obligation to determine whether subject-matter

5 jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  *See also* Fed. R.

6 Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter

7 jurisdiction, the court must dismiss the action.").  "Under Rule 12(b)(1), a defendant may

8 challenge the plaintiff's jurisdictional allegations in one of two ways.  A 'facial' attack

9 accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their

10 face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir.

11 2014) (citation omitted).  "A 'factual' attack, by contrast, contests the truth of the plaintiff's

12 factual allegations, usually by introducing evidence outside the pleadings." *Id.*

13        B.    **Dismissal Under Rule 12(b)(6)**

14        "[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege

15 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

16 face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting

17 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the

18 plaintiff pleads factual content that allows the court to draw the reasonable inference that

19 the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

20 "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and

21 are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation

22 omitted).  However, the Court need not accept legal conclusions couched as factual

23 allegations.  *Iqbal*, 556 U.S. at 679-680.  Moreover, "[t]hreadbare recitals of the elements

24 of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679.

25 The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*,

26 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

27        …

28        …

II.    <u>Count One</u>

A.    **The Parties' Arguments**

In Count One, entitled "Failure of ONHIR to Provide Community Facilities and Services for Navajo Relocatees," the Nation alleges that ONHIR was required to "develop for relocatee households at their relocation sites community facilities and services, such as water, sewers, roads, schools, and health facilities, as well as power, telephone, and other utilities, all of which are essential for successful relocation." (Doc. 1 ¶¶ 120-28.) The Nation further alleges that ONHIR has failed to carry out this obligation. (*Id.* ¶ 127.) The Nation thus seeks a declaration, under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), that ONHIR has failed to meet its infrastructure obligations. (*Id.* ¶ 128.) The Nation also alleges that, absent such a declaratory judgment "and injunctive relief to compel performance," the Nation and its citizens will be irreparably harmed. (*Id.*)

Defendants address Counts One and Two collectively, arguing that both should be dismissed because they fail to challenge "discrete agency action" as required under the Administrative Procedure Act ("APA"). (Doc. 20 at 6.) As for Count One specifically, Defendants contend that, even assuming a duty to provide infrastructure exists (which Defendants dispute given the apparent removal of the infrastructure-related language via the 1988 amendments), any such duty leaves ONHIR with a great deal of discretion, and because the Nation is seeking "wholesale judicial management of ONHIR"—that is, the Nation asks the Court to compel ONHIR to comply with *all* provisions of the Settlement Act, set timelines, and retain jurisdiction to ensure compliance—this constitutes a broad programmatic challenge that is not permissible under the APA. (*Id.* at 6-11.)

The Nation responds that Count One "seeks a declaratory judgment under the DJA on ONHIR's duty under the Relocation Act to ensure community facilities and services for relocatees and only relies on the APA for a sovereign immunity waiver." (Doc. 25 at 5.) Thus, the Nation contends that the Court may consider Count One "regardless of the APA's final agency action requirements." (*Id.*) The Nation acknowledges that the DJA is only a procedural device but argues that jurisdiction exists here because, under 28 U.S.C. § 1362,

"an Indian tribe may pursue a claim in federal district court so long as 'the matter in controversy arises under the Constitution, laws, or treaties of the United States,'" and because § 702 of the APA "waives federal sovereign immunity for non-monetary non-APA claims against federal agencies to enforce specific federal duties, such as Indian breach of trust claims." (*Id.* at 6-7.)   Finally, the Nation identifies various reasons why, notwithstanding the 1988 amendment, ONHIR should be deemed to have a continuing obligation to ensure that infrastructure exists at relocation sites. (*Id.* at 7-9.)

In reply, Defendants state they "assumed the claim relied on the APA because the portion of the Nation's Prayer for Relief that seeks the relevant injunction cites § 706(1)." (Doc. 28 at 4 n.4.)   At any rate, Defendants argue that "[t]he Nation cannot rely on the DJA to create jurisdiction or a cause of action." (*Id.* at 4 n.5.)   Defendants contend that the Nation is attempting to recast Count One as a breach of trust claim, even though no such claim appears in the complaint, and argue that Count One would fail even if recast in this fashion because the Nation does not "identify a substantive federal law that establishes a specific, enforceable fiduciary duty." (*Id.* at 4-5 & n.6.)   More specifically, Defendants argue that the provisions cited by the Nation do not contain express trust language or evince congressional intent to create an enforceable trust relationship. (*Id.* at 5-7.)

## B.    **Analysis**

The dismissal analysis concerning Count One is complicated by the parties' disagreement as to the nature of that claim.   In the motion to dismiss, Defendants characterize Count One as a claim under § 706(1) of the APA and argue that it fails to satisfy the "discrete agency action" requirement that applies to § 706(1) claims. *See generally Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004) ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010-11 (9th Cir. 2021) ("It is axiomatic that Plaintiffs must identify an 'agency action' to obtain review under the APA.   An agency action is circumscribed and discrete, such as a rule, order, license, sanction or relief.   A

plaintiff or petitioner must direct its attack against some particular 'agency action' that causes it harm.  This limitation on judicial review precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act.") (cleaned up).  In response, the Nation disclaims any reliance on § 706(1) with respect to Count One and does not dispute Defendants' contention that, if Count One *were* construed as a claim under § 706(1), it would be subject to dismissal because it raises an impermissible programmatic attack.  (Doc. 25 at 1 ["Defendants cannot avoid that claim based on irrelevant APA limits for final agency actions."].)[5]  Accordingly, to the extent Count One is a claim arising under § 706(1) of the APA, it is dismissed without leave to amend.[6]

If Count One isn't a claim under § 706(1) of the APA, what is it?  The Nation provides the following description of Count One in its response: "The first claim . . . properly seeks a declaration under the Declaratory Judgment Act ('DJA') and a sovereign immunity waiver in the [APA] that the Relocation Act requires [ONHIR] to assure that community facilities and services, such as water, sewers, roads, schools, and health care

---

[5]     In the tentative ruling, the Court stated that it was objectively reasonable for Defendants to interpret Count One as a § 706(1) claim.  However, during oral argument, the Nation identified reasons why, in its view, Count One should have been reasonably understood as a breach-of-trust claim.  The Court concludes that, regardless of which side was at fault for the initial confusion, it would benefit from additional briefing in which both sides share the same understanding of Count One.

[6]     Defendants argue this dismissal should be pursuant to Rule 12(b)(1).  (Doc. 20 at 11.)  On the one hand, Defendants' cited cases seem to support the notion that when an APA claim is dismissed based on a failure to challenge final or discrete agency action, the dismissal is for lack of subject-matter jurisdiction.  *Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir. 2006); *Ctr. for Biological Diversity v. Veneman*, 394 F.3d 1108, 1113 (9th Cir. 2005) ("Because the Center fails to allege a discrete agency action . . . we affirm the district court's dismissal for lack of subject matter jurisdiction.").  On the other hand, the Ninth Circuit's more recent decision in *Whitewater Draw* arguably takes a contrary approach.  There, the district court concluded the APA claim in Count II should be dismissed under Rule 12(b)(6) because it asserted an impermissible "broad programmatic attack" and the Ninth Circuit affirmed without stating that the dismissal should have been under Rule 12(b)(1).  5 F.4th at 1007, 1010-1012.  Although the court noted (without resolving) a dispute over whether a *different* APA claim should have been dismissed under Rule 12(b)(1) or Rule 12(b)(6), it did not suggest this dispute extended to Count II.  *Id.* at 1007 n.3.  Other courts have noted the seeming lack of consistency in this area.  *Long Term Care Pharmacy Alliance v. Leavitt*, 530 F. Supp. 2d 173, 187 n.7 (D.D.C. 2008) ("While several leading cases address this question as an issue of standing and subject matter jurisdiction under Rule 12(b)(1), other courts have resolved the issue under Rule 12(b)(6).") (citations omitted).  At any rate, regardless of whether the dismissal is under Rule 12(b)(1) or Rule 12(b)(6), Count One is dismissed without leave to amend to the extent it is an APA claim under § 706(1).

facilities, are available for Navajo relocatees."  (Doc. 25 at 1.)

Unfortunately, this description does not fully address the considerations that bear on whether a claim against a federal agency should survive dismissal.  *See generally Kialegee Tribal Town v. Zinke*, 330 F. Supp. 3d 255, 263 (D.D.C. 2018) ("When bringing a lawsuit against the United States, a plaintiff must identify: (1) a source of subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action.").  For example, although the Nation emphasizes that it is seeking declaratory relief under the DJA, that statute "is a procedural device only; it does not confer an independent basis of jurisdiction on the federal court.  A declaratory judgment action may be entertained in federal court only if the coercive action that would have been necessary, absent the declaratory judgment procedure, could have been heard in a federal court."  *Guar. Nat. Ins. Co. v. Gates*, 916 F.2d 508, 511 (9th Cir. 1990).  Accordingly, for Count One to survive dismissal, the Nation must also "identify a cause of action under some other law."  *Tex. Health & Human Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 712 (N.D. Tex. 2016).  *See generally Bisson v. Bank of Am., N.A.*, 919 F. Supp. 2d 1130, 1139-40 (W.D. Wash. 2013) ("[T]he court cannot grant declaratory relief in the absence of a substantive cause of action. . . .  The Declaratory Judgment Act creates only a remedy, not a cause of action.  Plaintiffs might have a claim for declaratory relief if they could properly plead a cause of action that establishes that they have a legal right to the information they seek."); *Pettit v. Fed. Nat. Mortgage Ass'n*, 678 F. App'x 468, 469 (9th Cir. 2017) (affirming "the district court's judgment dismissing [t]his action seeking a declaratory judgment" because the plaintiff "failed to allege facts sufficient to state a viable cause of action").

Similarly, although the Nation correctly notes that § 702 of the APA creates a waiver of sovereign immunity when a plaintiff asserts a non-APA claim for non-monetary relief against a federal agency, *see Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1168-72 (9th Cir. 2017) ("*Navajo Nation I*"), which is how the Nation characterizes Count One, that observation does not address the distinct question of whether Count One, so

characterized, qualifies as a valid non-APA claim.[7]

On that issue, the Nation has clarified that Count One is an "Indian breach of trust claim," predicated on "ONHIR's fiduciary duty to ensure community facilities and services for Navajo relocates," that is analogous to the breach-of-trust claim analyzed by the Ninth Circuit in *Navajo Nation v. Department of Interior*, 26 F.4th 794 (9th Cir. 2022) ("*Navajo Nation II*"). (Doc. 25 at 6-7.) Although Defendants attempt to address the validity of such a claim in their reply, the Court concludes that it would be inappropriate to delve into the merits of that issue on this record. The Court's review of *Navajo Nation II* and some of the authorities cited in Defendants' reply suggests that any analysis of whether a fiduciary duty exists in this context (which is a prerequisite to asserting the sort of breach-of-trust claim the Nation wishes to assert) would be quite complicated. However, due to the manner in which the briefing sequence unfolded, the issue is not comprehensively briefed.

Under the circumstances, the best solution is to dismiss Count One to the extent it is a claim under § 706(1) of the APA, clarify that Count One is actually a breach-of-trust claim, and grant Defendants leave to file a second motion to dismiss with respect to Count One.[8]

…

…

…

---

[7]     Similarly, to the extent the Nation seeks to rely on 28 U.S.C. § 1362 (Doc. 25 at 6), that statute does not bear on whether Count One is premised on a valid cause of action. *Kialegee Tribal Town*, 330 F. Supp. 3d at 263-64, 266; *Little River Band of Ottawa Indians v. NLRB*, 747 F. Supp. 2d 872, 883-85 (W.D. Mich. 2010).

[8]     Another option, which was discussed in the tentative ruling issued before oral argument, would be to dismiss Count One with leave to amend. This approach would allow the Nation to add allegations in support of its breach-of-trust theory, at which point Defendants could file a motion to dismiss the amended pleading. However, during oral argument, the Nation stated that no amendments are necessary. Accordingly, in lieu of dismissing Count One in its entirety and granting leave to amend, the Court will simply allow Defendants to file another motion to dismiss now that the nature of Count One has been clarified. *Cf. Hasbrouck v. Yavapai County*, 2021 WL 321894, *12 (D. Ariz. 2021) ("[E]ven though a party is ordinarily barred by Rule 12(g)(2) from filing a successive motion to dismiss on grounds that could have been raised in an earlier dismissal motion, the Court will permit the County to file another dismissal motion that addresses Count One.") (citing *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017)).

III.   Count Two

A.   **The Parties' Arguments**

In Count Two, entitled "Unreasonabl[e] Delay By ONHIR In Completing Relocation Of Navajos From Hopi-Partitioned Land," the Nation alleges that "the 35-year delay here beyond an express statutory deadline for completion of relocation . . . is categorically unreasonable" and contends that "[t]his Court must 'compel agency action unlawfully held or unreasonably delayed'" pursuant to 5 U.S.C. § 706(1).  (Doc. 1 ¶¶ 130-31.)  The Nation also alleges that "expediting delayed relocation should not unduly affect other ONHIR activities . . . since ONHIR's basic function concerns relocation . . . [and] to the extent that ONHIR itself has difficulty . . . [in] properly complet[ing] relocation, ONHIR possesses explicit statutory authority to call upon other departments and agencies for assistance."  (*Id.* ¶ 134.)  The Nation concludes that "[a]bsent a declaratory judgment confirming ONHIR's unreasonable delay in completing relocation of Navajo citizens and injunctive relief to compel the performance of that long-overdue legal obligation, the Nation and over 50,000 of its citizens spread across many Navajo Chapters will continue to be immediately, continuously, and irreparably harmed by ONHIR's ongoing illegal actions."  (*Id.* ¶ 137.)

Defendants contend that Count Two should be dismissed under Rule 12(b)(1) because it fails to challenge a discrete agency action that is subject to judicial review under the APA.  (Doc. 20 at 6-11.)  Defendants characterize Count Two as raising a "sweeping programmatic challenge" because it seeks to compel ONHIR to "comply with all provisions of the Settlement Act and Relocation Plan" and contend that the Supreme Court has determined that such broad, programmatic attacks are impermissible.  (*Id.* at 9.)  Defendants also note that the Nation doesn't allege that ONHIR hasn't provided *any* infrastructure, but rather challenges the "adequacy" of ONHIR's performance (*i.e.*, the speed of relocation), and argues that a challenge to general deficiencies in compliance is not specific enough to qualify as "agency action."  (*Id.* at 9-10.)

In response, the Nation acknowledges that Count Two is a claim under § 706(1) of

the APA but disputes that Count Two raises an impermissible programmatic attack; "[r]ather, the second claim seeks one thing: to compel completion of relocation since it is already more than 35 years past the date by when the [Settlement] Act required [completion]. . . .  All additional details are merely context and do not detract from that sole . . . relief."  (Doc. 25 at 9-10.)  The Nation argues that the APA empowers courts to compel agency action unlawfully withheld or unreasonably delayed, even if the agency's action entails some discretionary judgment, and to retain jurisdiction to enforce compliance within a certain timeline.  (*Id.* at 10, 12.)  For example, the Nation contends that "a court can compel 'issuance of a plan for future trust administration as a whole' based on specific findings of failure to comply with governing statutory duties."  (*Id.* at 10, citation omitted.)  According to the Nation, such court-ordered mandates "contrast with claims for wholesale, programmatic improvement."  (*Id.*)  As for the unreasonableness of the delay, the Nation contends that there was a specific statutory command to complete relocation within five years of the relocation plan taking effect (*i.e.*, by July 1986), prior cases have established that a delay of less than 36 years is unreasonable, there are intolerable impacts to health and welfare stemming from the delay, ONHIR has no higher competing priorities to address, and it is irrelevant that there is no evidence of impropriety on ONHIR's part in causing the delay.  (*Id.* at 11-12.)

In reply, Defendants reiterate that Count Two seeks to compel ONHIR, via the APA, to promptly perform the entirety of its remaining functions and contend that "[t]he Nation does not . . . explain how seeking to compel an agency to perform the entirety of its functions could possibly be considered discrete."  (Doc. 28 at 2-3.)  Defendants also argue that the Nation seeks sweeping relief and the micromanagement of ONHIR's compliance, notwithstanding ONHIR's discretion in deciding how to achieve relocation, and argues that "the APA does not empower a court to supervise an agency's compliance with a broad statutory mandate.  Courts cannot simply enter a general order compelling compliance with a statutory mandate and then determine whether compliance was achieved."  (*Id.* at 3-4 [cleaned up].)

B.     **Analysis**

Under the APA, "the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion." *Lujan v. Defenders of Wildlife*, 497 U.S. 871, 882 (1990) (citations omitted).  The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. §§ 551(13), § 701(b)(2).  These categories all "involve circumscribed, discrete agency actions, as their definitions make clear."  *SUWA,* 542 U.S. at 62.  Thus, for APA purposes, a "failure to act" is "properly understood as a failure to take an *agency action—that is, a failure to take one of the agency actions . . . earlier defined.*"  *Id.*  It follows that a plaintiff bringing a failure-to-act claim under § 706(1) must allege "that an agency failed to take a *discrete* agency action that it is *required* to take."  *Id.* at 64.  A corollary to these principles is that the APA "precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act."  *Whitewater Draw*, 5 F.4th at 1010-11 (cleaned up).  "Plaintiffs either must identify a particular action by [the agency] that they wish to challenge under the APA, or they must pursue their remedies before the agency or in Congress."  *Id.* at 1012.

Count Two is subject to dismissal under these standards because it fails to target discrete agency action and instead raises a programmatic attack.  In Count Two, the Nation seeks to compel ONHIR to complete all of its multifaceted obligations and responsibilities pertaining to relocation as described in the Relocation Act.  (Doc. 1 ¶¶ 135-36 [alleging that ONHIR's unreasonable delay has caused prejudice to "over 16,000 already relocated Navajos and over 33,000 other Navajos within their communities who remain severely impacted by waiting decades for provision of essential community facilities and services for relocates" and seeking "injunctive relief to advance prompt, proper completion of Navajo relocation"]; *id.* at 58 [asking the Court to "compel ONHIR under the APA to promptly complete unreasonably delayed relocation per the Relocation Plan under the Relocation Act . . . , including without limitation completion of benefits eligibility determinations, land selections, provision of individual or family relocation benefits, and

- 14 -

provision for relocatees at their relocation sites of community facilities and services, such as water, power, telephone, sewers, roads, schools, and health facilities"].)  Additionally, the Nation seeks to place the Court in an active oversight role, which would include creating and enforcing "a strict timeline for action by ONHIR and DOI with specific deadlines subject to modification based only on new information showing that modification is required, with the Court retaining jurisdiction to ensure compliance pending completion of relocation."  (*Id.* at 59.)

Courts have repeatedly held that such claims cannot be brought under the APA.  In *Lujan*, the Supreme Court rejected a "challenge [to] the entirety of petitioners' so-called 'land withdrawal review program'" because the program was "not an 'agency action' within the meaning of § 702, much less a 'final agency action'" and instead was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans."  497 U.S. at 890.  The Court acknowledged the possibility that "violation of the law is rampant within this program" but held that, even if this were true, the plaintiffs could not "seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  *Id.* at 891.  Similarly, in *SUWA*, the Supreme Court rejected a request for declaratory and injunctive relief premised on a federal agency's "failure to act to protect public lands in Utah from damage caused by [off-road vehicle] use," emphasizing that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives is not contemplated by the APA."  542 U.S. at 65-67.  And again, in *Whitewater Draw*, the plaintiffs challenged a federal agency's alleged failure "to consider the environmental impacts of various immigration programs and immigration-related policies."  5 F.4th at 1003-04.  The district court granted the agency's motion to dismiss this claim under Rule 12(b)(6) and the Ninth Circuit affirmed, holding that a plaintiff asserting an APA claim "must direct its attack against some

*particular* agency action that causes it harm" and, as a result, the APA "precludes broad programmatic attacks, whether couched as a challenge to an agency's action or failure to act." *Id.* at 1010 (cleaned up). The court held that the plaintiffs' claim qualified as an impermissible programmatic attack because "the challenged 'programs' merely refer to continuing operations of DHS in regulating various types of immigration." *Id.* at 1012. Although the court acknowledged that requiring a "case-by-case approach is understandably frustrating to those seeking across-the-board relief," it concluded that "Plaintiffs either must identify a particular action by DHS that they wish to challenge under the APA, or they must pursue their remedies before the agency or in Congress." *Id.* at 1011-12 (cleaned up). As one treatise summarizes: "The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'" 33 Charles Alan Wright et al., Fed. Prac. and Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update).

The Nation attempts to distinguish its claim in Count Two from the above-cited authorities by arguing that it simply seeks a declaration that ONHIR must comply with a statutory deadline, and "[a]ll of the other details are merely context and do not detract from that sole warranted and viable relief." (Doc. 25 at 10.) This argument fails for several reasons. For one thing, although it is true that "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act," *SUWA*, 542 U.S. at 65, the Nation does not simply request a declaration concerning compliance with a deadline—it also asks the Court to assume an oversight role of indefinite duration over ONHIR's multitude of relocation functions. But "[t]he obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." *Village of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 194 (4th Cir. 2013).

Another problem is that, in the unreasonable delay cases cited by the Nation, the

action that the agency failed to complete was a truly discrete action, such as issuing a proposed rule in response to a particular rulemaking petition, *In re A Community Voice*, 878 F.3d 799 (9th Cir. 2017); or responding to a particular rulemaking petition, *Pesticide Action Network N. Am. v. EPA*, 798 F.3d 809 (9th Cir. 2015); or providing health care and health-related notifications to a discrete group of test subjects, *Vietnam Veterans of Am. v. Central Intelligence Agency*, 811 F.3d 1068 (9th Cir. 2016).  Here, in contrast, the Nation seeks to compel ONHIR—which "shall cease to exist when the President determines that its functions have been fully discharged," *see* 25 U.S.C. § 640d-11(f)—to complete the entirety of its statutory functions by a court-determined deadline, even though the President has *not* decreed that its functions have been fully discharged, while the Court serves in an oversight role.  It is an understatement to say that this request is dramatically different from sort of agency-inaction claims that courts have found cognizable under § 706(1).

Finally, and in a related vein, the Nation acknowledged during oral argument that it is unaware of any case in which a court has ordered an agency to complete the entirety of its functions by a deadline.  In the Court's view, the absence of such authority is telling.  It is difficult, even when taking into account the uniqueness of ONHIR's structure and purpose, to see how the Nation's request here could qualify as anything short of a programmatic attack.[9]

In sum, the Nation's request to require ONHIR to complete all of its relocation duties by a court-ordered deadline, with the Court acting as a compliance monitor, qualifies as a broad programmatic attack that is not cognizable under the APA.  The Court does not, in any way, discount the Nation's frustration with the pace of the relocation effort, but the judicial branch of our system of government lacks the competence and constitutional prerogative to provide the sort of relief that Count Two seeks.  As the Ninth Circuit recently noted, "systemic challenges seeking wholesale improvement by court decree [are] properly matters that should be pursued in [agency offices] or the halls of Congress, where

---

[9]     The tentative ruling included a discussion of whether Congress may have approved or acquiesced in the delay.  Because that discussion, which the Nation challenged during oral argument, is unnecessary to the outcome here, it has been removed.

1    programmatic improvements are normally made. . . .  [T]his case-by-case approach is

2    understandably frustrating to those seeking across-the board relief . . . [but] more sweeping

3    actions are for the other branches."  *Whitewater Draw*, 5 F.4th at 1011-12 (cleaned up).

4    Accordingly, Count Two is dismissed.[10]

5    III.    Count Three

6            A.    **The Parties' Arguments**

7            In Count Three, entitled "Failure By ONHIR to Fully Discharge Its Functions

8    Before Working To Close," the Nation alleges that "ONHIR has stated an intention to

9    close, has developed plans for that, and has actively worked to prepare for closure.

10   However, ONHIR still has much work to do to complete relocation and has not provided

11   information that could facilitate a determination by the President that ONHIR's functions

12   have been fully discharged, as required for ONHIR to cease operations."  (Doc. 1 ¶ 140.)

13   Accordingly, the Nation seeks a declaration "that ONHIR has not fully discharged its

14   functions and may not cease to exist unless and until there is a Presidential determination

15   that ONHIR's functions have been fully discharged" and an injunction "to prevent

16   premature closure and unauthorized closure of ONHIR."  (*Id.* ¶ 141.)

17           Defendants identify various reasons why Count Three should be dismissed.  (Doc.

18   20 at 11-14.)  First, Defendants argue that Count Three "must rely on the APA's right of

19   action" because the relevant provision of the Settlement Act contains no "rights-creating

20   language" and does not confer an implied right of action upon the Nation.  (*Id.* at 11-12.)

21   Defendants continue that, if Count Three is an APA claim, it necessarily fails because the

22   challenged agency conduct (*i.e.*, stating an intention to close and actively working to

23   prepare for closure) are not discrete or final agency actions.  (*Id.* at 12-13.)  Second, and

24   seemingly in the alternative, Defendants contend that Count Three should be dismissed

25   under Rule 12(b)(6) because "ONHIR has no statutory obligation or authority to terminate

26   its own operations, [and] there is no basis for the Court to mandate that ONHIR 'may not

27

28   _____

[10]      As discussed in footnote six, it is not clear whether this dismissal should be pursuant
to Rule 12(b)(1) or Rule 12(b)(6), but dismissal is warranted regardless.

cease to exist unless and until there is a Presidential determination that ONHIR's functions have been fully discharged.'" (*Id.* at 13-14.)

In response, the Nation first argues that Defendants' concession that only the President can terminate ONHIR's operations actually supports Count Three, because it confirms that ONHIR may not itself take further action to close. (Doc. 25 at 12-13.) Next, the Nation disputes Defendants' characterization of Count Three as an APA claim, arguing that Count Three actually "seeks a declaratory judgment for a non-monetary, non-APA claim against a federal agency for compliance with a specific federal duty, here based on violation of a specific federal proscription." (Doc. 25 at 12-13.) As a result, the Nation argues that "[t]his claim is not subject to the APA's final agency action restriction." (*Id.* at 13.) The Nation argues that "[l]ike for the non-APA claim in *Navajo I* and *Navajo II* to enforce a Navajo treaty, a private right of action is not required here." (*Id.*) The Nation further argues that the Relocation Act creates an implied right of action to assert a premature closure claim because (1) the "the Relocation Act was specially enacted to benefit the Nation and Navajos subject to relocation, including host communities, and . . . an implied cause of action for the Nation on behalf of itself and affected Navajos is consistent with the purposes of the Relocation Act"; (2) "there are exclusively federal affirmative fiduciary obligations to Navajos required to relocate from HPL under the Relocation Act"; and (3) "the Relocation Act provides for remedial litigation by the Nation and the Hopi Tribe on behalf of their citizens," which helps "inform" the jurisdictional analysis for non-intertribal litigation under the Relocation Act. (*Id.* at 13-15.)

In reply, Defendants contend that the Nation has no right of action with respect to Count Three because (1) there is no explicit, rights-creating language in the relevant statutory provisions; (2) the fact that Congress enacted the Settlement Act to benefit Navajo relocatees is, in itself, insufficient to create an implied right of action; (3) the relevant provisions here don't focus on the individuals protected or the parties being regulated, but rather focus on the agency that will do the regulating; and (4) the existence of a right of action under one statutory section (here, the provision addressing inter-tribal disputes) does

1    not mean such a right of action exists with respect to other sections.  (Doc. 28 at 7-9.)  Next,

2    Defendants reiterate their contention that, to the extent Count Three is an APA claim, if

3    fails due to a lack of discrete or final agency action.  (*Id.* at 10.)    Finally, Defendants

4    reiterate their contention that Count Three also fails as a matter of law because ONHIR is

5    not the proper defendant to this claim and no actual controversy exists between the

6    parties—although the Nation seeks a declaratory judgment that ONHIR may not close until

7    there has been a determination by the President that its function has been fully discharged,

8    Defendants agree with this assertion.  (*Id.* at 10-11.)

9        B.    **Analysis**

10       Count Three is subject to dismissal for two independent reasons.

11       The first, which was not apparent to the Court when it issued the tentative ruling but

12   became more apparent during oral argument, is that Count Three does not present a

13   justiciable controversy.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time

14   that it lacks subject-matter jurisdiction, the court must dismiss the action.").  The Nation

15   seeks a declaration that ONHIR "has not fully discharged its functions and may not cease

16   to exist unless and until there is a Presidential determination that ONHIR's functions have

17   been fully discharged" (Doc. 1 ¶ 141), but Defendants are in full agreement on these points

18   and acknowledge that ONHIR cannot cease to exist in the absence of a presidential decree.

19   (Doc. 28 at 11.)

20       Given the absence of an actual controversy between the parties as to this core issue,

21   the Court lacks authority to grant relief.  "As required by Article III, courts may adjudicate

22   only actual cases or controversies.  When presented with a claim for a declaratory

23   judgment, therefore, federal courts must take care to ensure the presence of an actual case

24   or controversy, such that the judgment does not become an unconstitutional advisory

25   opinion." *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007).  *See also*

26   *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994) (noting that the DJA's

27   statutory requirement of an "actual controversy" is "identical to Article III's constitutional

28   case or controversy requirement").  "To qualify as a case fit for federal-court adjudication,

an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citations and internal quotation marks omitted). Here, where both sides agree that ONHIR has not fully discharged its functions and cannot close until the President makes the necessary decree, there would be no point in the Court issuing a confirmatory declaration or injunctive relief to that effect.

When pressed on this issue during oral argument, the Nation stated that it believes there "is a case or controversy because ONHIR is . . . actively taking steps to *prepare* for closure rather than implementing relocation." In response, the Court asked whether an agency that "thinks it's in the final stretches of its mission" is allowed to simultaneously "continu[e] to complete its mission while also taking steps to close, because as soon as it completes those final steps, it will then close." The Nation replied that "an agency can do that in general" but asserted that "the challenge here is that ONHIR is spending . . . precious time and resources working to close instead of implementing relocation." In the Court's view, this exchange exacerbates rather than resolves the justiciability problem. Not only is the Nation seeking a declaration as to a particular issue (*i.e.*, whether ONHIR has fully discharged its functions and may close in the absence of a presidential decree) as to which there is no actual controversy, but the asserted injury that gives rise to the Nation's claim in Count Three (*i.e.*, ONHIR's diversion of resources away from relocation efforts and toward closure efforts) would not be redressed by the relief the Nation seeks—even if the Court declared that ONHIR has not fully discharged its functions and may not close in the absence of a presidential decree (and then issued injunctive relief to that effect), ONHIR would remain free to continue *preparing* to close and to continue allocating resources toward those preparation efforts. This poses a redressability problem. *Cf. Juliana v. United States*, 947 F.3d 1159, 1168-71 (9th Cir. 2020) (noting that Article III standing requires a showing that the asserted injury "is likely redressable by a favorable judicial decision" and holding that the plaintiffs' claim for "remedial declaratory and injunctive relief" was likely deficient as to this requirement because "an order simply enjoining [the challenged]

activities will not . . . ameliorate [plaintiffs'] injuries" and "[a] declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action").

Alternatively, even if Count Three presented a justiciable controversy, it would be subject to dismissal due to the absence of a valid cause of action. On this issue, the Nation disclaims any reliance on the APA, so the analysis turns on whether the Relocation Act should be construed as creating an implied right of action to bring a claim related to ONHIR's premature closure.

"A plaintiff may only bring a cause of action to enforce a federal law if the law provides a private right of action. The ability to bring a private right of action may be authorized by the explicit statutory text or, in some instances, may be implied from the statutory text. However, an implied right of action is only authorized when there is clear evidence Congress intended such a right to be part of the statute." *Nisqually Indian Tribe v. Gregoire*, 623 F.3d 923, 929 (9th Cir. 2010) (citations omitted). Thus, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Supreme Court has "outlined a four-factor inquiry for determining whether a statute provides an implied right of action. These factors are: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create or to deny a private right of action; (3) whether it is consistent with the underlying purposes of the legislative scheme to imply a private right of action; and (4) whether the cause of action is one traditionally relegated to state law." *Nisqually Indian Tribe*, 623 F.3d at 929 (citing *Cort v. Ash*, 422 U.S. 66 (1975)) (cleaned up). However, "[s]ince announcing this test, the Supreme Court has elevated intent into a supreme factor, and *Cort*'s other three factors are used to decipher congressional intent." *Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 5 F.4th 952, 958 (9th Cir. 2021) (citation and internal quotation marks omitted). *See also Logan v. U.S. Bank Nat. Ass'n*, 722 F.3d 1163, 1171 (9th Cir.

2013) ("Because the Supreme Court has elevated intent into a supreme factor, we start there and do not feel constrained by the *Cort* framework.").

Additionally, "[w]hether a federal statute provides a private right of action almost always arises in the context of a claim against a third party, such as a state or private entity, not . . . against the federal government." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096 (9th Cir. 2005). Indeed, "the term 'private right of action' is something of a semantic mismatch in the context of a suit to force agency action under a federal statute." *Id.* This is because the APA provides "an alternative means of ensuring that government officials comply with the dictates of a federal statute." *Id.* at 1095. As then-Judge Breyer once observed, in a passage that has been quoted with approval by the Ninth Circuit, the existence of the APA means that "federal action is nearly always reviewable for conformity with statutory obligations without any such 'private right of action'" and makes it "difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need for Congress to do so." *Id.* at 1095-96 (quoting *N.A.A.C.P. v. Sec'y of HUD*, 817 F.2d 149, 152 (1st Cir. 1987)).

Given these principles, and if writing on a blank slate, the Court would have little trouble concluding that the Relocation Act does not create an implied right of action to challenge ONHIR's premature closure. As *San Carlos Apache Tribe* recognizes, the very notion of a federal statute creating an implied right of action against the federal government is a "semantic mismatch"—through the APA, Congress has already created a framework for challenging the action (and inaction) of federal agencies. Here, the Nation concedes (or, at least, fails to dispute) that Count Three would fail as an APA claim due to the absence of final or discrete agency action. This is a strong signal that Congress didn't intend for the Relocation Act to create an implied right of action to bring such a claim. *Cf. El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 890 (D.C. Cir. 2014) ("We hold below that the Tribe has no viable action under the APA in this case, but that does not change our analysis here. Indeed, if anything, the absence of an APA claim here 'only

reinforces our view that the [statute] creates no implied right of action' . . . .  In the absence of clear indicia of intent to the contrary, we hold that the Indian Dump Cleanup Act does not provide an implied right to sue.") (citation omitted).

Even if this weren't a case against the federal government, the traditional considerations governing whether to find an implied right of action undermine the Nation's position.  Although the Settlement Act was, in general, enacted for the Nation's benefit, the specific provision underlying the Nation's claim in Count Three—the provision that ONHIR "shall cease to exist when the President determines that its functions have been fully discharged," *see* 25 U.S.C. § 640d-11(f)—does not include any rights-creating language and focuses not on the parties being protected but on the agency providing the protection.  In *Sandoval*, the Supreme Court held that when statutory language "focus[es] on the person regulated rather than the individuals protected" or, as here, is "yet a step further removed" and "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating," there is no reason to discern "congressional intent to create a private right of action."  532 U.S. at 289.  *See also Lil' Man in the Boat,* 5 F.4th at 958-60 (emphasizing that, under *Sandoval*, an implied right of action should not be recognized in the absence of "rights-creating language").

Finally, it is also notable that, in a different portion of the statute (25 U.S.C. § 640d-17), Congress authorized "[e]ither tribe, acting through the chairman of its tribal council, for and on behalf of the tribe," to assert four specific types of claims "against the other tribe": (1) a claim for "an accounting" related to certain "trader license fees or commissions, lease proceeds, or other similar charges" (*id.* § 640d-17(a)(1)); (2) a claim "for the determination and recovery of the fair value of" certain "grazing and agricultural" activities (*id.* § 640d-17(a)(2)); (3) a claim for "the adjudication of any claims that either tribe may have against the other for damages to the lands to which title was quieted," in which case "the United States may be joined as a party to such an action" (*id.* § 640d-17(a)(3)); and (4) a claim for "such further original, ancillary, or supplementary actions

against the other tribe as may be necessary or desirable to insure the quiet and peaceful enjoyment of the reservation lands of the tribes by the tribes and the members thereof, and to fully accomplish all objects and purposes of this subchapter" (*id.* § 640d-17(c)). Congress also specified that, apart from the third type of authorized claim, "[a]ny judgment or judgments by the District Court in such action or actions shall not be regarded as a claim or claims against the United States." *Id.* § 640d-17(d).  These provisions suggest that Congress was fully aware of how to create an express right of action for the tribes to bring Relocation Act-related claims, including Relocation Act-related claims against the federal government, yet chose not to authorize the type of claim being asserted here.  And "[w]here a statutory scheme contains a particular express remedy or remedies, a court must be chary of reading others into it.  Because Congress included an express provision for private enforcement under one section of the [statute], it is highly improbable that Congress absentmindedly forgot to mention an intended private action in the [another] section." *Logan*, 722 F.3d at 1172 (citations and internal quotation marks omitted).  *See also Lil' Man in the Boat*, 5 F.4th at 961 n.6 (same); *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (citation omitted).

The complicating factor here is that the Court does not necessarily write on a blank slate in light of *Benally v. Hodel*, 940 F.2d 1194 (9th Cir. 1990).  There, individual Navajo plaintiffs sought "a declaration that [ONHIR] is not complying with the relocation procedures described in the Settlement Act at 25 U.S.C. § 640d-11 to 640d-14." *Id.* at 1198.  "In particular, they allege[d] that the report and plan submitted to Congress by [ONHIR] did not comply with the dictates of 25 U.S.C. § 640d-12." *Id.*  The district court dismissed the plaintiffs' claims for lack of standing and Ninth Circuit affirmed, holding "that the Settlement Act does not create a procedural right in individual Hopi and Navajo Indians.  Nothing in either the language of the Settlement Act or its legislative history suggests that individuals can make the sort of broad challenges that appellants assert in this

action.  Although we are mindful that 25 U.S.C. § 640d-14(g) allows individuals to appeal benefits eligibility determinations in court, we do not agree that this provision establishes the right of individuals to challenge the broad procedural framework of the Settlement Act, especially where, as here, the complaint alleges violations that affect all relocatees generally.  Instead, we agree with the district court that the Settlement Act vests an implicit procedural right in the chairmen of the Navajo and Hopi tribes to bring the type of claims at issue here."  *Id.* at 1199.  The court continued: "The Settlement Act establishes that it is the tribal chairmen who can vindicate individual rights in an intertribal dispute 'to fully accomplish all objects and purposes of' the Settlement Act, P.L. 93-531 § 18(c); 25 U.S.C. § 640d-17(c).  It is this broad right of action which we read as implying a procedural right in tribal chairmen to challenge government compliance with the dictates of the Settlement Act."  *Id.* (citing *Sidney v. Zah*, 718 F.2d 1453, 1457 (9th Cir. 1983)).  The court concluded: "Congress decided that individual rights would be vindicated by the tribal chairmen in the context of intertribal disputes.  We conclude that Congress meant for tribal chairmen also to challenge the government's application of the Settlement Act on behalf of the generalized rights of relocatees."  *Id*.

In the Nation's view, *Benally* stands for the proposition that the Relocation Act creates an implied right of action under which it may assert *any* claim related to compliance with the Relocation Act, so long as the claim seeks to advance the generalized rights of Navajo relocatees.  (Doc. 25 at 16.)  Acknowledging that this argument presents a close call—there are passages in *Benally* that can be viewed as supporting the Nation's position—the Court discerns three reasons why *Benally* should not be given such a broad interpretation.  The first is that *Benally*'s implied-right-of-action analysis may no longer be good law in light of subsequent Supreme Court decisions.  *Benally* must be treated as a binding authority unless it is "clearly irreconcilable with an intervening decision by a higher authority," and "[i]t is not enough for there to be some tension between the cases or for the intervening authority to cast doubt on" *Benally*.  *Tingley v. Ferguson*, __ F.4th __, 2022 WL 4076121, *12 (9th Cir. 2022) (cleaned up).  Although this is a very difficult

standard to meet, the Ninth Circuit has suggested that the Supreme Court's 2001 decision in *Sandoval* is just the sort of intervening authority that may call into doubt the validity of pre-2001 decisions concerning implied rights of action. *Schmitt v. Kaiser Foundation Health Plan of Wash.*, 965 F.3d 945, 953-54 (9th Cir. 2020) ("For a time, the Supreme Court had construed Title VI to allow disparate impact claims . . . [but] *Sandoval* shut that door. Before the disparate impact door closed, though, we and other circuits relied on the Title VI authority to hold that the Rehabilitation Act permits disparate impact claims. [I]t is unclear whether a disparate impact theory remains permissible under the Rehabilitation Act after *Sandoval* . . . .") (citations omitted). And as discussed above, *Sandoval* addressed a question that is very similar to the question presented here—whether to imply a right of action based on statutory language that "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating," *see* 532 U.S. at 289—and concluded that an implied right of action should not be recognized in that circumstance.[11]

Second, even assuming that *Benally* remains good law post-*Sandoval*, it specifically addressed whether individual Navajo relocatees could bring a claim challenging ONHIR's failure to "comply with the dictates of 25 U.S.C. § 640d-12" when submitting a proposed relocation plan to Congress. *Benally*, 940 F.2d at 1198. Here, the Nation seeks to assert a claim based on a purported violation of an entirely different statutory subsection, 25 U.S.C. § 640d-11(f), which has no rights-creating language and simply addresses the circumstances under which ONHIR may cease to exist. Accordingly, even if the Navajo and Hopi tribes have an implied right of action under *Benally* to bring a § 640d-12 claim challenging the adequacy of the relocation plan submitted by ONHIR, it doesn't necessarily

---

[11] A Westlaw search reveals that *Benally* has only been cited by the Ninth Circuit seven times, with the latest occurring in 1999: (1) *Clinton v. Babbitt*, 180 F.3d 1081, 1083 n.2 (9th Cir. 1999); (2) *Espinoza v. Dunn*, 48 F. 3d 1227 (9th Cir. 1995) (unpub.); (3) *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1354 (9th Cir. 1994); (4) *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1302 (9th Cir. 1993); (5) *Citizens Interested in Bull Run, Inc. v. Reilly*, 992 F.2d 1219 (9th Cir. 1993) (unpub.); (6) *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1581 n.9 (9th Cir. 1993); and (7) *Downer v. Hodel*, 977 F.2d 588 (9th Cir. 1992) (unpub.). Thus, there is no indication that the Ninth Circuit has affirmed the post-*Sandoval* validity of *Benally*'s implied-right-of-action analysis.

follow that the tribes also have an implied right of action to bring a § 640d-11(f) claim challenging ONHIR's closure plans.  *Rapid Transit Advocates, Inc. v. S. Cal. Rapid Transit Dist.*, 752 F.2d 373, 378 (9th Cir. 1985) ("Existence of a private right under one section of [an] Act does not mean such a right exists under other sections of the Act.").[12]  And under the implied-right-of-action precedents that have developed post-*Sandoval*, it is clear that § 640d-11(f) shouldn't be interpreted as creating such an implied right of action.

Third, the Court finds it notable that *Benally* characterized the individual plaintiffs' complaint as "in substance challeng[ing] agency action and inaction under the [APA]." 940 F.3d at 1198.  These claims failed, the court continued, not due to a lack of discrete or final agency action but because "the complaint alleges violations that affect all relocatees generally" and thus the individual plaintiffs lacked "article III" standing.  *Id.* at 1199.  *See also id.* at 1198 n.5 ("Of course, appellants can dispute in federal court a benefits determination pursuant to 25 U.S.C. § 640d-14(g).  But were the broad challenges asserted in this case the only ones made in such a proceeding, appellants would lack standing because it would be wholly speculative whether the relief they sought would redress their injury—inadequate relocation benefits. . . .  [E]ven were we to conclude that [ONHIR] violated its statutory duty to report to Congress, we could not be confident that [ONHIR] would alter its award in a subsequent benefits determination.").  The court concluded that, because other provisions in the Settlement Act empowered "tribal chairmen [to] vindicate individual rights in an intertribal dispute," it followed that the tribes themselves should be authorized to assert claims that were "of equal concern to all relocatees."  *Id.*  1199-1200.

*Benally*'s characterization of the individual plaintiffs' claims as "in substance" APA

---

[12]     The Court acknowledges that *Benally* is not a model of clarity concerning the nature of the individual Navajo relocatees' claims and the resulting scope of the tribes' implied right to bring such claims.  For example, although the body of the opinion focuses on the § 640d-12 claim, a footnote suggests the individual plaintiffs also sought to assert claims related to other statutory subsections (albeit none related specifically to § 640d-11(f)).  *Benally*, 940 F.2d at 1195 n.2.  Thus, it is unclear whether the opinion's holding that "Congress meant for tribal chairmen . . . to challenge the government's application of the Settlement Act on behalf of the generalized rights of relocatees," *id.* at 1200, should be interpreted an unqualified authorization for the tribes to bring *any* claim related to compliance with the Relocation Act or as a more limited authorization for the tribes to bring the specific claims at issue in *Benally*.

claims is potentially significant because it suggests the court was not attempting to authorize some new species of implied statutory claim against the federal government in which the usual APA requirements of discrete and final agency action are inapplicable, but was simply construing the Settlement Act to ensure that *some* entity would have standing to assert what are, in substance, traditional APA claims challenging agency compliance with a statutory scheme.  If *Benally* is construed in this fashion, it is easier to harmonize with *San Carlos Apache Tribe*, which explains why courts should be wary of construing federal statutes to imply a right of action against the federal government that is more expansive than the right of action already provided by the APA.  *San Carlos Apache Tribe*, 417 F.3d at 1096-97 ("To permit a case to proceed directly under a federal statute and bypass the APA is not without consequence.  The APA includes a series of procedural requirements litigants must fulfill before bringing suit in federal court. . . .  Were litigants able to sue directly under [a federal statute], they would be able to sidestep the traditional requirements of administrative review under the APA without express Congressional authorization.  As Judge Breyer noted, creating a direct private action against the federal government makes little sense in light of the administrative review scheme set out in the APA.").  But if *Benally* is construed in this harmonizing fashion, Count Three must be dismissed, because the Nation does not dispute that final and discrete agency action are lacking with respect to its claim of premature closure.

Accordingly, and again recognizing that the implied-right-of-action aspect of the analysis presents a close call, Count Three is dismissed.[13]

…

…

…

---

[13]     Regardless of whether the dismissal of Count Three is due to the lack of a justiciable controversy or the absence of a private right of action, the dismissal is pursuant to Rule 12(b)(1).  *Logan*, 722 F.3d at 1165-66 & n.1 (noting that "the district court . . . reasoned that it did not have subject matter jurisdiction over Logan's claim for damages under the PTFA because the Act does not create a private right of action," affirming the district court's conclusion on this issue, and elsewhere acknowledging that "the dismissal [was] for lack of subject matter jurisdiction").

IV.    Count Four

    A.    **The Parties' Arguments**

In Count Four, entitled "Failure By ONHIR To Obtain And DOI To Provide Reasonable Interagency Assistance In Implementing The Relocation Plan," the Nation alleges that ONHIR has "recognized the necessity for interagency assistance to complete relocation," "affirmed that [it] will call for the assistance of DOI and other agencies as necessary to implement relocation," and "called upon other agencies to assist in implementing relocation," but has otherwise "either unreasonably failed to call upon other agencies to fulfill that necessity or unreasonably failed to require that such requested reasonable assistance be provided."  (Doc. 1 ¶ 145.)  The Nation further alleges that ONHIR has instead "called upon DOI to assist in addressing ONHIR's recordkeeping and accounting issues and DOI has volunteered assistance in planning for the [premature] closure of ONHIR . . . ."  (*Id.* ¶ 146.)  The Nation thus seeks a declaratory judgment, and corresponding injunctive relief, that ONHIR must obtain (and DOI must provide) reasonable assistance to support implementing the Relocation Plan.  (*Id.* ¶¶ 147-48.)

Defendants argue that Count Four must be dismissed.  (Doc. 20 at 14-17.)  As with Count Three, Defendants argue that Count Four "must rely on the APA's right of action" because the relevant provision of the Settlement Act, 25 U.S.C. § 640d-11(e), contains no "rights-creating language" and does not confer an implied right of action upon the Nation.  (*Id.* at 14-15.)  Defendants contend that, if Count Four is an APA claim, it necessarily fails because "the Nation identifies no discrete action that ONHIR, the agency authorized to seek assistance, let alone DOI, an agency that ONHIR merely could have called upon, were required (but failed) to take under Section 640d-11(e)."  (*Id.* at 15-16.)  According to Defendants, "nothing in Section 640d-11(e)(1) . . . *unequivocally* commands ONHIR to request agency assistance, or compels DOI, a separate federal agency, to provide reasonable assistance that has not even been requested.  To the contrary, the statute 'authorize[s]' ONHIR to seek agency assistance, but leaves whether or not to do so, when to do so, with what agencies to do so, and the terms on which to do so in the discretion of

ONHIR.  As numerous courts have recognized, statutes that simply 'authorize' an agency to act do not impose a mandatory duty that can be compelled under § 706(1) or through a writ of mandamus." (*Id.* at 16.)  Finally, Defendants contend that Count Four also fails as an APA claim because "even if Section 640d-11(e)(1) creates a duty of interagency assistance, which it does not, any such duty is not discrete. . . .  The claim essentially asks the Court to become a conductor in a symphony of federal agencies—a result injecting the Court into day-to-day management of multiple federal agencies." (*Id.* at 16-17.)

In response, the Nation argues, as it did with respect to Count Three, that the Relocation Act creates an implied right of action under which it may challenge ONHIR's compliance with the Act, including the failure of agencies to obtain and provide necessary assistance in implementing relocation, and that Count Four is therefore "not subject to the APA's final agency action restriction." (Doc. 25 at 16.)  The Nation also argues that although § 640d-11(e) contains discretionary language, an agency's decision reviewable "if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." (*Id.* at 16-17.)  Acknowledging that the Court can make this determination only by looking to the complaint, the Nation argues that "[i]n enacting Section 640d-11(e), Congress expected that DOI and other federal agencies coordinate with [ONHIR]," that the Relocation Plan itself recognized the need for interagency coordination, that ONHIR has affirmed this need, and that "ONHIR has asked and obtained assistance from DOI, but to facilitate premature . . . closure of ONHIR rather than relocation," which "constitutes an abuse of discretion by ONHIR and a failure by DOI to provide required reasonable assistance under the Relocation Act.  All this supports a declaration that ONHIR must obtain and DOI must provide reasonable assistance in implementing the Relocation Plan." (*Id.* at 17.)

In reply, Defendants argue that the Nation lacks a right of action with respect to Count Four, and because the Nation disavows reliance on the APA, Count Four must be dismissed. (Doc. 28 at 7.)  Defendants also reiterate that Count Four fails as a matter of law because § 640d-11(e) simply "authorizes" ONHIR to call for assistance but does not

1   require it to do so from a particular agency, or to seek assistance at all, and courts have

2   found that authorizing an action is not the same as imposing a mandatory duty that can be

3   compelled through an injunction.  (*Id.* at 10-12.)  As for the Nation's argument that the

4   Court can discern a meaningful standard by which to review ONHIR's exercise of

5   discretion, Defendants contend that this argument is misplaced because it pertains to APA

6   claims under § 701(a)(2), not § 706(1).  (*Id.* at 11.)  Finally, Defendants reassert that the

7   relevant statutory language does not refer to DOI, so absent a request from ONHIR, DOI

8   had no duty to assist in relocation.  (*Id.* at 12.)

9         B.   **Analysis**

10        The implied-right-of-action analysis with respect to Count Four largely mirrors the

11  analysis with respect to Count Three.  The Nation, which concedes that Count Four cannot

12  survive dismissal if it is an APA claim, argues that Count Four is actually brought pursuant

13  to an implied right of action arising from the Relocation Act.  But as discussed with respect

14  to Count Three, no such implied right of action exists—(1) the statutory provision on which

15  Count Four is based, 25 U.S.C. § 640d-11(e), contains no rights-creating language and is

16  concerned solely with the activities of ONHIR (*Sandoval*; *Lil' Man In the Boat*); (2) it

17  would be anomalous to discern an implied right of action against the federal government

18  when the APA already provides a pathway to challenge agency action and inaction (*San*

19  *Carlos Apache Tribe*); (3) Congress's enumeration of other ways in which the Nation may

20  bring claims based on the Relocation Act, including one type of claim against the federal

21  government, suggests that Congress didn't implicitly intend to create a right of action to

22  challenge compliance with § 640d-11(e) (*Logan*; *Lil' Man In The Boat*); and (4) *Benally*

23  may no longer be good law in light of *Sandoval*, did not specifically authorize claims based

24  on § 640d-11(e), and did not appear to authorize Relocation Act-based claims in the

25  absence of discrete, final agency action (which is lacking here).[14]

26        Alternatively, even if the Relocation Act could be construed as creating an implied

---

[14]      As discussed in the preceding footnote, to the extent the dismissal of Count Four is based on the absence of an implied right of action, the dismissal is pursuant to Rule 12(b)(1).

right of action to bring the sort of claim the Nation seeks to advance in Count Four, that claim would be subject to dismissal under Rule 12(b)(6) for failure to state a claim. The relevant statutory language provides that ONHIR "is authorized to call upon any department or agency of the United States to assist [it] in implementing the relocation plan, except that the control over and responsibility for completing relocation shall remain with [ONHIR]. If any case in which [ONHIR] calls upon any such department or agency for assistance under this section, such department or agency shall provide reasonable assistance so requested." 25 U.S.C. § 640d-11(e)(1). Because this "authorization" language is permissive, ONHIR has no obligation to seek assistance from other agencies (let alone a specific obligation to seek assistance from DOI). As a result, the Nation has not plausibly alleged that ONHIR committed any statutory violation that might give rise to an implied claim under § 640d-11(e)(1).

The decision in *Trout Unlimited v. Pirzadeh*, 1 F.4th 738 (9th Cir. 2021), which the Nation cited in its brief and emphasized during oral argument, does not compel a different conclusion. In *Trout Unlimited*, the EPA issued a proposed determination that would restrict certain mining activity in an area of southwestern Alaska but then withdrew the proposed determination after holding hearings and soliciting comments. *Id.* at 743. After an environmental organization sought to challenge the agency's withdrawal decision under § 706(2)(A) of the APA, on the ground that it was arbitrary, capricious, an abuse of discretion, or contrary to law, the agency defendants "moved to dismiss on the ground that the EPA's withdrawal fell within an exception to reviewability for agency actions 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2)." *Id.* at 744. The Ninth Circuit explained that this "exception . . . applies only if no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Id.* at 751 (citation omitted). The court elaborated:

> [T]he mere fact that a statute contains discretionary language does not make agency action unreviewable. Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this

- 33 -

court may review its exercise of discretion.  We will find jurisdiction to
review allegations that an agency has abused its discretion by exceeding its
legal authority or by failing to comply with its own regulations.  In those
situations, the agency has chosen to constrain its own discretion via
regulations that carry the force of law.  So long as the regulations provide a
meaningful standard by which a court could review the agency's actions and
our review of the agency's compliance with those regulations does not
infringe any of the agency's prerogatives under the statute, then we have
jurisdiction, pursuant to the APA, to review the agency's compliance with its
own regulations.

*Id.* at 751-52 (cleaned up).

As an initial matter, because the Nation makes clear that Count Four is not an APA claim, it is unclear how much weight should be given to APA decisions like *Trout Unlimited* when assessing Count Four's viability.  Additionally, *Trout Unlimited* involved a challenge under § 706(2)(A) of the APA, which authorizes challenges to agency actions that are arbitrary, capricious, or an abuse of discretion, but Count Four seems to more closely resemble a challenge under § 706(1) of the APA, which as discussed elsewhere in this order governs challenges to "compel agency action unlawfully withheld or unreasonably delayed."  (*See, e.g.*, Doc. 1 ¶ 145 ["ONHIR either has unreasonably failed to call upon other agencies to fulfill that necessity or unreasonably failed to require that such requested reasonable assistance be provided."].)

At any rate, even assuming the same standards apply in this context, *Trout Unlimited* explains that when a plaintiff seeks to establish a violation of statutory language—such as the interagency-assistance language in § 640d-11(e)—that seemingly grants unfettered discretion to an agency, the plaintiff must establish that the agency failed to "comply with its own regulations" because "[i]n those situations, the agency has chosen to constrain its own discretion via regulations that carry the force of law."  *Id.* at 751.  Count Four fails under this standard because the Nation has not identified any regulation carrying the force of law (or other qualifying agency practice) in which ONHIR recognized the necessity of seeking assistance from DOI.  During oral argument, the Nation asserted that paragraphs 54, 57, 60, 67, 90, 91, and 92 of the complaint support its position on this point, but a

review of those paragraphs shows that they do not provide the necessary support:

▪ Paragraph 54 cites a conference report from 1980 in which members of Congress expressed the expectation that various "Federal agencies having programs and resources which are available to Indian tribes" would "coordinate with their efforts with the tribes and [ONHIR] to . . . ease the burdens of relocation." This is not an *ONHIR* agency practice or *ONHIR* regulation carrying the force of law. Nor does the conference report suggest that ONHIR made a determination that assistance from DOI was necessary.

▪ Paragraph 57 cites a provision of the 1981 relocation plan in which ONHIR recognized that "[c]oordination of agency efforts is necessary" and that piecemeal approaches to problem-solving are non-productive. It is unclear whether the relocation plan qualifies as a regulation carrying the force of law, given that it was a proposal that Congress was ultimately responsible for adopting or rejecting. In this respect, it differs from the formal ONHIR regulations codified at 25 C.F.R. § 700 *et seq.* that are cited in other paragraphs of the complaint. (Doc. 1 ¶¶ 49-51.) Yet even assuming the relocation plan qualifies as an agency practice or policy that *could* provide a meaningful standard of review in this context, *see, e.g., Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) (concluding that "various memoranda through which the INS implemented its repapering policy" qualified as "established agency policies" that provided a meaningful standard of review), the provision cited in paragraph 57 does not amount to a determination by ONHIR that assistance from DOI was necessary—instead, it reflects a generalized statement about the necessity of inter-agency coordination.

▪ Paragraph 60 cites a different provision in the relocation plan that "affirmed that [ONHIR] 'will call for the assistance [of] the [BIA], [IHS,] and other agencies as deemed necessary' to implement the relocation program." As with the previous example, it is unclear whether the relocation plan qualifies as an agency regulation carrying the force of law or an expression of agency policies or practices that could provide a meaningful standard of review in this context. More important, the cited provision simply recognizes that ONHIR will seek assistance from other agencies "as deemed necessary." This is not

1    the same thing as a determination that ONHIR had, in fact, concluded that assistance from

2    DOI was necessary.

3         ▪ Paragraph 67 cites a provision in a "transmittal letter" that ONHIR submitted to

4    Congress in 1983, as part of "an update to Congress on significant developments since

5    submission of the Relocation Plan," in which ONHIR reported that it "planned to

6    coordinate with other federal agencies to address employment, roads, utilities, and similar

7    needs."  This is not a regulation carrying the force of law, does not appear to be an

8    established agency policy or practice, and does not, in any event, qualify as a determination

9    by ONHIR that assistance from DOI was necessary.

10        ▪ Paragraph 90 does not appear to address ONHIR's evaluation of the necessity of

11   assistance from other agencies (let alone from DOI).  Instead, it faults ONHIR for engaging

12   in premature closure activities and for not compiling certain information.

13        ▪ Paragraph 91 cites a series of reports that DOI issued in 2019.  Such reports

14   obviously do not qualify as regulations issued by ONHIR that have the force of law or

15   policies or practices of ONHIR.  Additionally, paragraph 91 does not allege that any of

16   these reports included an evaluation by ONHIR of the necessity of assistance from DOI.

17        ▪ Paragraph 92 cites three more reports issued by DOI in 2020.  Again, such reports

18   could not qualify as regulations issued by ONHIR that have the force of law or policies or

19   practices of ONHIR.  Additionally, paragraph 92 provides no details about the substance

20   of those reports.[15]

21        For these reasons, the Nation's claim in Count Four against ONHIR fails to state a

22   claim.  So, too, does the claim in Count Four against DOI.  At most, § 640d-11(e)(1)

23   compels DOI to "provide reasonable assistance *so requested*," but the Nation

24   acknowledged during oral argument that DOI has never refused a request for relocation

25   _____

26   [15]      To the extent the Nation's response brief identifies paragraphs 80 and 82 of the
     complaint (which the Nation did not identify during oral argument) as providing additional
     support for its position (Doc. 25 at 17), the Court disagrees.  Those paragraphs discuss
27   statements in a report issued by the ONHIR commissioner in 1990.  Such a report is not a
     regulation carrying the force of law and may not qualify as an agency policy or practice.
28   More important, none of the cited statements is a determination by ONHIR that assistance
     from DOI was necessary.

assistance from ONHIR.[16]

V.     Leave to Amend

Although the Nation does not request leave to amend in the event of dismissal (Doc. 25 at 17 [only requesting that "Defendants' motion to dismiss . . . be fully denied"]), the Ninth Circuit has suggested that, in certain circumstances, "a district court should grant leave to amend even if no request to amend the pleading was made." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted).

Here, because Count One is not being dismissed (except to clarify that it is not a § 706(1) claim), the only question is whether leave to amend should be granted as to Counts Two, Three, and Four.  The Court concludes that leave to amend should be denied as to those claims because they are being dismissed based on legal deficiencies that could not be cured through the pleading of new facts.  *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment . . . constitutes an exercise in futility . . . .").  Additionally, during oral argument, the Nation did not request leave to amend as to Counts Two, Three, and Four.

…

…

…

…

…

…

---

[16] During oral argument, the Court asked the Nation to identify its "best factual allegation showing that ONHIR made a request to DOI to provide assistance with relocation but DOI did not comply with that request."  In response, the Nation acknowledged that "[w]e cannot say that ONHIR has specifically requested that Interior provide assistance with relocation other than the historical reports regarding the necessity and the prior reports regarding an interagency task force."  Later, when asked to identify the specific date of any "request to help with relocation from ONHIR to DOI," the Nation responded: "We cannot point to a specific recent request, but we know that ONHIR had previously had an interagency task force to address relocation in particular regarding infrastructure."  And in response to the follow-up question of "[w]hat's the allegation that DOI didn't comply with that request?", the Nation stated: "We do not allege that the Interior did not comply with that request."

Accordingly,

**IT IS ORDERED** that:

1.       Defendants' motion to dismiss (Doc. 20) is **granted in part**.  Counts Two, Three, and Four are **dismissed without leave to amend**.

2.       Defendants may file a renewed motion to dismiss Count One within 21 days of the issuance of this order.

Dated this 29th day of September, 2022.



Dominic W. Lanza
United States District Judge